Nott, Ch. J.,
delivered the opinion of the court:
It is an established principle of international law that a nation is responsible for wrongs done by its citizens to the citizens of a friendly power. Ordinarily this responsibility is discharged by a government rendering to a resident alien the same protection which it affords to its own citizens and bringing the perpetrators to trial and punishment. This responsibility of a nation for the acts of its individual members is so well established and regulated by international law that it falls little short of being a natural right.
In like manner, though in a varying degree, the Government of the United States has always held an Indian tribe in amity to a like responsibility. The maintenance of peace on the one hand and the protection of its citizens on the other may be said to have been the two fundamental principles of the Government’s Indian policy. The Indian tribes did not rise to the rank of independent nations, and the relations between them and the United States were peculiar. Consequently the assertion of the right to demand satisfaction for outrages committed upon property was generally made by statutes and not by treaties. These statutory declarations began in 1796 (1 Stat. L., 469) and continued until 1874 (Revised Stat., § 2156. Between these there came the very important and elaborate statute of 30th June, 1834 (4 Stat. L., 731, § 17), which codified our Indian policy, and which, with some modifications in 1859 (11 Stat. L., 401) and 1872 (17 Stat. L., 190), was reenacted in the Revised Statutes, and thus continued until the present day, or at least until the Indian Depredation Act of 1891. These statutes may not be binding *434 upon tbe Indians in one sense, when the Indians are considered as treaty-making powers; but they are nevertheless declarations of the intention of the United States to hold the Indian tribes to a national or quasi international responsibility, and they indicate and define the extent or limits of this national or tribal liability as the United States understand it to exist. In the courts of the United States that effect must be given to the statutes. They must be regarded as an authoritative declaration of the quasi international law applicable to dependent Indian nations; that is to say, they must be regarded as correctly defining and laying down the limitations of tribal responsibility.
From 1796 until 1867 this declaration of the United States, that “satisfaction” must be made by a tribe for the unlawful depredations of its members, was thus proclaimed generally through their statutes. In 1867 the Government first introduced into an Indian treaty a provision looking toward the surrender of the wrongdoers as the tribal “satisfaction” which might be made for wrongs inflicted by its members in the stead of money indemnification. The act of 1834 had said and in 1867 continued to say:
“And be it further enacted, That if any Indian or Indians belonging to any tribe in amity with the United States shall, within the Indian country, take or destroy the property of any person lawfully within such country, or shall pass from the Indian country into any State or Territory inhabited by citizens of the United States, and there take, steal, or destroy any horse, horses, or other property belonging to any citizen or inhabitant of the United States, such citizen or inhabitant, his representative, attorney, or agent, may make application to the proper superintendent, agent, or subagent, who, upon being furnished with the necessary documents and proofs, shall, under the direction of the President, make application to the nation or tribe to which said Indian or Indians shall belong for satisfaction; and if such nation or tribe shall neglect or refuse to make satisfaction in a reasonable time, not exceeding twelve months, it shall be the duty of such superintendent, agent, or subagent to make return of his doings to the Commissioner of Indian Affairs that such further steps may be taken as shall be proper, in the opinion of the President, to obtain satisfaction for the injury; and, in the meantime, in respect to the property so taken, stolen, or destroyed, the United States guarantee to the party so injured an eventual indemnification.” (Section 17.)
*435 The treaty 21st October, 1867, with the Kiowas and Comanches (15 Stat. L., 58Í) then introduced into our Indian policy a new element, thus declared:
“If bad men among the Indians shall commit .a wrong or depredation upon the person or property of anyone, white, black, or Indians, subject to the authority of the United States and at peace therewith, the tribes herein named solemnly agree that they will, on proof made to their agent and notice by him, deliver up the wrongdoer to the United States, to be tried and punished according to its laws, and in case they wilfully refuse so to do, the person injured shall be reimbursed for his loss from the annuities or other moneys due or to become due to them under this or other treaties made with the United States. And the President, on advising with the Commissioner of Indian Affairs, shall prescribe such rules and- regulations for ascertaining damages under the provisions of this article as, in his judgment, may be proper; but no such damages shall be adjusted and paid until thoroughly examined and passed upon by the Commissioner of Indian Affairs and the Secretary of the Interior; and no one sustaining loss, while violating or because of his violating, the provisions of this treaty or the laws of the United States, shall be reimbursed therefor.” (Art. 1.)
Nine such treaties were made. At that time there were more than one hundred tribes, bands, or entities with which the Government had made treaties or would thereafter make treaties or which the Interior Department and this court would regard as sufficiently Indian bodies politic to be made Indian defendants in these cases and to be made to respond for the judgments which might be recovered against them. Tet these thirteen treaty-making tribes, parties to and represented by the nine treaties, were the great and warlike and dominant powers of the Indian race then existing on this continent — the Kiowas and Comanches, the Apaches, the Cheyennes and Arapahoes, the different bands of the Sioux, the Crows, the Northern Cheyennes and-Arapahoes, the Navajoes, the Eastern Shoshones and Bannocks, and the Utes. (See treaties October 21, 1867, 15 Stat. L., 581; October 21, 1867, ib., 589; October 28, 1867, ib., 593; April 29, 1868, ib., 635; May 7, 1868, ib., 649; May 10, 1868, ib., 655; June 1, 1868, ib., 667; July 3, 1868, ib., 673; March 2, 1868, ib., 619.) Nearly all of the Indian wars that have raged since 1867 have been wars with these thirteen tribes or with some of them or with some *436 subdivision of them. The magnitude of their depredations,, ' moreover, has been relatively, as well as intrinsically, enormous. In Willbarger’s History of Depredationsin Texas it is said that • “within a circle of 100 miles of Parker County,”^! the end of 1875, there had been stolen and destroyed (by Kiowas and Comanches) $6,000,000 worth of property, and there had been killed and carried into captivity nearly four hundred persons. In General Miles’s Reminiscences it is said that when the war with the Apaches finally ended, on the 8th of September, 1887, and the removal of Indians from Arizona began, “people who had abandoned their mines and had not seen them for months or years returned to them again, and the value of horse and cattle ranches increased 50 per cent” (p. 528). It may be said, in a word, that the term “Indian depredations” since the first of these treaties was signed, October 21, 1867, means depredations by one or more of these thirteen tribes, or that from that day the term has little, if any, practical signification.
The question therefore which the court has now to consider is whether substantially all of the Indian depredations committed since the making of these treaties are to be left without -judicial redress.
The making of the treaties was apparently the institution of a new Indian policy — a policy which would induce the tribes -to give up their offenders instead of paying for their offenses by a commuual tax upon their annuities — a policy which would tend to weed out the worst criminals among the Indians and stamp in their estimation depreciations as crimes. But the policy instituted by the treaties never was instituted in fact. The provision of the first article remained a dead letter. The President never “prescribed rules and regulations for ascertaining damages;” the United States never notified an Indian tribe to deliver up a wrongdoer; no tribe ever willfully refused so to do, or was offered an opportunity to refuse; no person, by virtue of any one of these nine treaties, ever became entitled to “be reimbursed for his loss from the annuities or other moneys due or to become due” to any one of these treaty-making tribes. Depredations continued to be made by individual Indians, who sometimes could be and sometimes could not be identified as belonging to a certain tribe; and in some cases, though not in all, the claims for property destroyed and stolen were presented by an agent to a tribe, which ordinarily denied all *437 knowledge of tbe depredation or attributed it to tbe Indians of other tribes; and there tbe matter rested. On tbe one side the United States never demanded tbe wrongdoer; on tbe other side no Indian tribe ever offered to deliver him up. In practical effect tbe treaty was as if it bad never been written.
If effect bad been given by tbe treaty-making parties to tbe provision of the first article, it would seem to tbe court almost self-evident that tbe treaty or treaties bad established a new condition to tbe liability of a tribe and bad given an option by which a tribe could escape tbe payment of a moneyed indemnification and relieve itself from responsibility by the surrender of tbe responsible wrongdoer. A statute or treaty is not to be interpreted in one way because it will determine only one case and in another way because it will determine a great number of cases; but tbe question here is not a question of interpretation. Tbe meaning of tbe treaty seems to tbe court plain; but tbe multitude of cases which have arisen under all of tbe treaties witness to tbe intent and purpose of tbe treaty-making parties. A provision as to which there have been innumerable opportunities for invoking it when it could be carried into practical effect, and of which it must be said that during twenty-five years and through ten thousand opportunities it was never invoked in one single instance by either party, is not a provision which should be brought forth and invoked for the first time in judicial proceedings and for the purpose of evading a just liability for the violation of what was little less, as herein-before said, than a natural right. When these treaties were made, the responsibility of the tribes had long been recognized.The treaties did not relieve them from responsibility; they only established a new method of enforcing it, which new method when resorted to might vary the liability. Neither party to any treaty understood that responsibility was at an end; neither party resorted to the treaty as the method for enforcing or. discharging responsibility. The depredations°went on as fully as they had gone on before. Such being the situation, it does not seem reasonable to suppose that either party understood or believed that the settled policy of the Government had been abandoned and that depredations could go on unrestrained and the tribes in amity be exempt from tribal liability. On' fuller investigation and consideration we think it must be held that both of the treaty-making parties mutually abandoned *438 tbe first article so soon as it was made; that it was never treated as obligatory by either of them, and that it must be regarded by the judiciary as one which almost immediately became obsolete.
In this conclusion the court is confirmed by the general consensus of all who have had anything to do with Indian affairs. Neither the Indian defendants, nor their counsel, nor the Attorney-General, nor any committee or Member of Congress in reports or debates upon the subject, nor any officer of the Government connected with Indian affairs has ever suggested that these ti eaties and the inaction of the Government relieved these treaty-making tribes from liabilities. Litigation under the Indian Depredation Act of 1891 has gone on for six years in the charge of successive Attorneys-General and different law officers of the Government, and many judgments have been rendered against Indian defendants where this provision would have been a defense, and cases have been carried to the Supreme Court, where it might have been made a ground for reversal, and yet its significance has escaped all eyes. The provision was first brought to the attention of the court in an oral argument, and the case was remanded for reargument where the point was involved; but even then the magnitude of the question was not revealed by the argument, and it escaped the attention of the court that tbe provision had been inserted in so many treaties, and that it had been ignored in every case where it might have been invoked. While adhering to the interpretation of the treaty as given in the opinion in the Brown Case, the court must regard it as inoperative for the reasous hereinbefore set forth.
In the consideration of this question.the court has perceived no reason for giving a new interpretation to the act of 1891. It remains, in the opinion of the court, an act simply conferring jurisdiction as against the Indian defendants. It assumes, indeed, a liability for and on behalf of the United States, but only in cases wheretan Indian tribe is held liable or would be held liable if the depredators had been identified and the tribe had been made a party defendant in the case. As regards the defendants, the United States, it is within the proper legislative discretion of Congress to create a liability, and liabilities given by statute alone are good causes of action when properly brought into the judicial forum; but it seems to the court abso *439 lutely impossible that Congress, when legislating in regard to these Indian tribes, intended to create liabilities where none existed by retroactive legislation.
Nevertheless, the Indian Depredation Act is significant in showing the understanding and belief of Congress in regard to our past transactions with the Indians. It virtually sweeps all Indian depredation claims against all Indian tribes out of Congress and commits them to the jurisdiction of the court; and it evinces in many ways the belief of at least one of the treaty-making powers that the provision in the treaties of 1867 would be no bar to an investigation and recovery.
If the Indian tribes remained treaty-making powers in their early integrity, it might be said that this statute speaks only as to the understanding of the other party, the United States. But since the Act 3d March, 1871 (16 Stat. L., 566, § 1), the Indian tribes have ceased to be treaty-making powers and have become simply the wards of the nation. As such, Congress speaks for them and have become the legislative exponent of both guardian and ward. The judiciary, when dealing with these Indian tribes which are neither treaty-making powers nor natural persons, noi’ bodies politic or corporate, must look to some constituted power which has authority to speak and act on their behalf, to assert their rights and make concessions for them. They are the wards of the nation, but they are not the wards of the courts. The power which now speaks for them is the legislative power of the United States; and the latest expression of its authority is this act of 1891. Interpreting the act as a whole, in the light of past transactions, of existing claims, and of the obligations which have always been asserted by the Government against the Indian tribes, it seems to the court that while the statute created no new liability, it swept away all technical defenses, and consented, on behalf of both the guardian and the ward, that these Indian depredation cases, so far as may be possible, should be adjudicated upon their merits. As a matter of fact, the United States will have to respond in damages in the greater portion of these cases, for they have assumed liability and practically will have little recourse over. That fact can not change the law or enlarge the legal limitations of their liabilities; nevertheless an interpretation should not be given to past transactions which will enable the United States, as *440 defendants, to maintain a defense that amounts to nothing more than this — that by their own neglect they allowed the liability of the Indian defendants to lapse and thereby released themselves from liability.
The order of the court is that the claimant’s motion for a new trial be allowed, and that the judgment entered the 24th day of May, 1897, be vacated and set aside.