Littleton, Judge,
delivered the opinion of the court:
It is the position of the plaintiff that under the stipulation of Art. 10 of the 1868 Treaty with the Sioux Tribe of Indians the United States was obligated to furnish one cow and a pair of oxen to each and every family in the Sioux Tribe which removed to the reservation at any time and which, at any time thereafter, commenced to farm. Based on statistics from the report of the Commissioner of Indian Affairs for 1886 indicating that a total of 4,549 Indian families at the various agencies (including the Fort Peck Agency, the Indians which the defendant insists are not parties to this action) were “engaged in agriculture” during that year, the plaintiff contends that this is the number of families which was entitled to receive cows and oxen. On this basis it is contended that the Government incurred an obligation under Art. 10 of the treaty of $210 a family, or $955,290. After deducting the amount of $126,000 expended by the Government for the purposes mentioned under Art. 10, plaintiff seeks judgment for $829,290.
Defendant contends that the primary purpose of the Treaty of 1868, and particularly the stipulation of Art. 10, with reference to furnishing each family who commenced farming with one cow and two oxen was an added inducement to the tribe to abandon its nomadic life, settle upon the reservation, and at least make a start toward becoming self-sustaining; that the offer was open for acceptance by such families of the tribe as were already on the reservation or those who removed thereto within a reasonable time and *307 who commenced to farm within a reasonable time. It is further contended that it was obviously not the intention of the treaty makers that this offer under Art. 10 was to remain open for acceptance at the whim of the Indians at any time in the future, but only within a reasonable time after ratification of the treaty; that the plain intention of the treaty was that removal to the reservation and commencement of farming should be practically coincident; that the stipulation was so understood and interpreted by the Government, and that this interpretation is justified and sustained when other provisions of the treaty relating to the same subject matter are considered. Finally it is contended by defendant that the record fails to show that the amount of $126,000 appropriated in July 1870 and expended by the Secretary of the Interior between that date and 1880 was not sufficient to supply such families with the animals agreed to be furnished as had, in good faith, accepted the offer contained in Art. 10 and had commenced farming within the meaning of the treaty.
We agree with the defendant in proposition (1) that the whole purpose of Art. 10 was to induce the Indians to remove and settle upon the reservation immediately or within a reasonable time; (2) that the period of ten years from 1870, when the Congress made the appropriation of $126,000 for the purpose of carrying out its stipulation under Art. 10, to 1883, when the amount of that appropriation had been expended by the Secretary of the Interior for the purposes for which it was appropriated, was a reasonable time for the Indians to remove to the reservation and commence farming, and that there was no binding obligation upon the Government, after such reasonable period, to furnish the Indians with cows and oxen or to pay the Indians in money the equivalent purchase price of a cow and two oxen for each family; whether, after such a reasonable time, the Government should furnish such families as commenced farming with cows and oxen was a matter within the discretion of Congress; (3)' that the words “commence farming” used in Art. 10 of the Treaty must be interpreted by reference to Arts. 6 and 8 which define the term “to commence farming” and specify that which a head of a family shall do as indi- *308 eating a desire to commence farming. And (4) that the record does not show with any degree of certainty the number of lodges or families that commenced farming on the reservation at any of the agencies within a reasonable time after the ratification of the treaty in February 1869 and its proclamation by the President in the same month.
Proposition (1) above establishes only the underlying purpose of the Government undertaking stipulated in Art. 10. Finding 5 shows that it had little effect upon the majority of the Indians.
Proposition (2) is fully justified by the reasons for making the treaty and attempting to remove the Indians to a definitely defined reservation, and by all the circumstances surrounding the negotiation and the execution of the treaty. It seems clear from the record that the Congress regarded the period from the date of ratification of the treaty in 1869 until 1883, when the appropriation made for carrying out the provisions of Art. 10 of the treaty was exhausted, as a reasonable time within which the Indians might comply with the provisions of that article, and we can find nothing in the record or in the circumstances of the case that would justify this court in holding that a reasonable time extended to or beyond 1886. In February 1883 the Secretary of the Interior requested Congress to make an additional appropriation for the purchase of cows and oxen for the Sioux families “engaged in agriculture” on the reservation. There is no evidence that the families for which this appropriation was requested had commenced farming within the meaning of the treaty as we interpret it. Congress declined to make such an appropriation and no other appropriation, in addition to the amount of $126,000 appropriated in 1870, was ever made. Of course one party to a contract can not decline to carry it out with immunity but we think the reason for refusal of Congress to make a further appropriation was because it considered that the previous appropriation of $126,000 had discharged its obligation under Art. 10 with respect to the families that had removed to the reservation and commenced farming within a reasonable time. In the circumstances we cannot say that this conclusion of Congress was erroneous or in violation of the treaty.
*309 Proposition 3 above relates to the intent and meaning of the provisions of Art. 10 and the extent of the Government’s obligation thereunder. This provision of the treaty must be interpreted in the light of other provisions relating to the same subject. As will be seen from Art. 10, the United States stipulated that it would furnish and deliver to each lodge or family of persons legally incorporated with them, who should remove to the reservation and commence farming, one good American cow and one good well broken pair of American oxen within sixty days after such lodge or family should have settled upon such reservation. Standing alone this provision might be susceptible of the interpretation that any lodge or family covered by the treaty, who at any time removed to the reservation and engaged in agriculture to any extent should within sixty days thereafter be entitled to receive from the Government one cow and two oxen. But we think it is clear that this article would not have been worded in such broad and general terms if the matter of what should constitute “commence farming” had not been dealt with in earlier articles of the treaty. In Art. 6 it was provided that if any individual among said Indians being the head of a family “should desire to commence farming” he should have the privilege of selecting a tract of land within the reservation not exceeding 320 acres in extent and that any person over eighteen years of age, not being the head of a family, might select in like manner for purposes of cultivation land not to exceed eighty acres in extent. In Art. 8 it was provided that when the head of a lodge or family should have selected lands, as provided in Art. 6, and the Indian agent was satisfied that such head of a lodge or family intended in good faith to commence cultivating the soil for a living, he should receive certain supplies of seeds and agricultural implements. Art. 10 then proceeded to provide, among other things, for cows and oxen. It is therefore clear, we think, from these three provisions of the treaty considered together that before an Indian lodge or family of persons legally incorporated with them should be regarded as having commenced farming within the meaning of Art. 10, the head of such lodge or family must have indicated his desire to do so by! *310 selecting a tract of land as specified in Art. 6 and, after having selected such land, must have satisfied the Indian agent that he intended in good faith to commence cultivating the soil for a living; whereupon such lodge or family would be furnished a cow and two oxen as specified in Art. 10 and with seeds and agricultural implements as specified in Art. 8. That these articles must be read together for the purpose of interpreting the provisions of any one of them is clear from the fact that they all related to the same subject matter, namely, farming. A person cannot farm, until he has selected his land. A cow was to be furnished on the condition that the lodge or family had a farm. Of course oxen would be of no value to an Indian lodge or family, the head of which had not selected a tract of land for farming purposes, and neither would oxen be of any use to an Indian family without agricultural implements and seeds for the purpose of raising crops in the cultivation of the soil.
With reference to proposition (4), hereinbefore mentioned, it appears that in 1886 the Commissioner of Indian Affairs set forth in his annual report a digest of certain reports of the Indian Agents indicating that at that time there were 4,549 entire families “engaged in agriculture,” but an analysis of this statement upon information obtainable from the best available sources indicates that the number of acres being cultivated at each agency on the basis of the number of families at such agencies was very small. (See Finding 7.) Certainly with no more evidence than is disclosed by the Commissioner’s report of 1886, it would be impossible to hold that the number of families mentioned as engaged in agriculture was, in the light of the facts just mentioned, engaged in farming within the meaning of Arts. 6, 8, and 10 of the treaty and, to such an extent, as to bind the United States to pay the 4,549 families the amount of $829,290 because they had not been furnished in 1886 with one cow and two oxen. Moreover, Art. 8 of the 1868 treaty with the plaintiff tribe provided that any person over eighteen years of age and not the head of a family might select a farm not exceeding eighty acres. In such a case the United States incurred no specific obligation to furnish cows and oxen to *311 such persons separately from the heads of lodges or families, and it is not unreasonable to assume that the Indian agents in referring to the “number of Indian families engaged in agriculture” included Indians of a class just mentioned.
Counsel for defendant also makes the contention that under the provisions of the Jurisdictional Act this court is without jurisdiction to consider and determine the claims involved in this case for the reason that the Jurisdictional Act authorizes the court to consider and determine only claims for damages to the tribe as an entity and not to individual members thereof or to specific lodges or families of the tribe. Although we consider this contention not to be well founded it is unnecessary to discuss it in detail in view of our conclusions on other grounds that plaintiff is not entitled to recover. The petition is dismissed, and it is so ordered.
Whaley, Judge; Williams, Judge; GeeeN, Judge; and Booth, Chief Justice, concur.