**Venita TSOSIE, Plaintiff-Appellee,**

v.

**The UNITED STATES,
Defendant-Appellant.**

No. 87–1103.

United States Court of Appeals,
Federal Circuit.

July 30, 1987.

Kathleen P. Dewey, Dept. of Justice, Washington, D.C., argued for defendant-appellant. With her on the brief were F. Henry Habicht, II, Asst. Atty. Gen., Patricia L. Weiss and Robert L. Klarquist.

Stephen T. LeCuyer, Mettler & LeCuyer, P.C., of Albuquerque, N.M., argued for plaintiff-appellee.

Before RICH and DAVIS, Circuit Judges, and NICHOLS, Senior Circuit Judge.

NICHOLS, Senior Circuit Judge.

This case is here on an appeal, which we have permitted, seeking our review of an interlocutory order of the Claims Court denying a motion to dismiss or for summary judgment, but certifying that the order involves a controlling question of law with respect to which there is substantial ground for difference of opinion and that an immediate appeal may materially advance the ultimate termination of the litigation.

Plaintiff-Appellee, a Navajo Indian, sued in the Claims Court for relief under the Article I clause of the Navajo Treaty of June 1, 1868, 15 Stat. 667, which provides that if "bad men" among the whites commit "any wrong" upon the person or property of any Navajo, the United States will reimburse the injured person for the loss sustained. The trial court, (Yock, J.), was of the opinion that this treaty provision was obsolete and has been abandoned, 11 Cl.Ct. 62 (1986), but he felt constrained to hold the contrary by certain decisions of a predecessor of this court, the Court of Claims, to be discussed below. We hold, however, that the treaty provision in question, even if infrequently invoked, has not become obsolete or been abandoned or preempted in any sense that affects its enforceability by suit in the Claims Court under the Tucker Act, 28 U.S.C. § 1491. We have also reviewed other portions of

Judge Yock's order holding that the treaty provision does not fail because of an absence of subsequent legislation to implement it, and that article IV of the treaty does not preclude judicial review of any administrative decision that may ensue on the claim. We agree with those portions. We affirm the order appealed from, and the case will be returned to the Claims Court for further proceedings.

The government suggested that the case be heard in banc because of the possibility a panel of this court might feel constrained, as Judge Yock did, to make a decision contrary to its real beliefs because of the supposed binding effect of the Court of Claims' precedents. A majority of the active judges of the court did not vote for a hearing in banc. Moreover, none of the issues we now decide were discussed or decided in any of such precedents as we read them. Therefore, a decision favoring the government's position, as now stated by it, respecting any currently argued issues, would not have required us to overrule any precedents of this or any predecessor court. We have, therefore, given the government's arguments full consideration, feeling perfectly free to adopt them if we agreed with them, which we did not.

### Background

The treaty in question is one of nine made in 1868, by and between commissioners representing the United States and chiefs of various previously hostile Indian tribes. The treaties were all duly ratified, proclaimed, and published in volume fifteen of the *Statutes at Large*. All say that peace is their object and all contain "bad men" articles in similar language. The Navajo treaty, 15 Stat. 667, was made at Fort Sumner, New Mexico. As held in *Duran v. United States*, 32 Ct.Cl. 273 (1897), the Navajos had been at war with the United States in 1863, and being defeated, were detained thereafter as prisoners of war at Fort Sumner. The United States treaty commissioners included that famed and redoubtable warrior, Lt. General William T. Sherman. Negotiations with the Indian commissioners were recorded and are in the instant record. Article I embodies the two "bad men" clauses and is set forth below in full so its context may be appreciated. Article IV is also set forth.

ARTICLE I. From this day forward all war between the parties to this agreement shall forever cease. The government of the United States desires peace, and its honor is hereby pledged to keep it. The Indians desire peace, and they now pledge their honor to keep it.

If bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs at Washington city, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also to reimburse the injured persons for the loss sustained.

If bad men among the Indians shall commit a wrong or depredation upon the person or property of any one, white, black, or Indian, subject to the authority of the United States and at peace therewith, the Navajo tribe agree that they will, on proof made to their agent, and on notice by him, deliver up the wrongdoer to the United States, to be tried and punished according to its laws; and in case they wilfully refuse so to do, the person injured shall be reimbursed for his loss from the annuities or other moneys due or to become due to them under this treaty, or any others that may be made with the United States. And the President may prescribe such rules and regulations for ascertaining damages under this article as in his judgment may be proper; but no such damage shall be adjusted and paid until examined and passed upon by the Commissioner of Indian Affairs, and no one sustaining loss whilst violating, or because of his violating, the provisions of this treaty or the laws of the United States, shall be reimbursed therefor.

\*     \*     \*     \*     \*     \*

ARTICLE IV. The United States agrees that the agent for the Navajos shall make his home at the agency building; that he shall reside among them, and shall keep an office open at all times for the purpose of prompt and diligent inquiry into such matters of complaint by or against the Indians as may be presented for investigation, as also for the faithful discharge of other duties enjoined by law. In all cases of depredation on person or property he shall cause the evidence to be taken in writing and forwarded, together with his finding, to the Commissioner of Indian Affairs, whose decision shall be binding on the parties to this treaty.

Navajo Treaty of June 1, 1868, Arts. I & IV, 15 Stat. 667–68.

Other articles, not set out, provide for a permanent reservation to which the Navajos were to be removed from Fort Sumner, and also for allotment of land for farming within the reservation to individual Navajos, for United States Government aid to education of Navajos, to continue for 10 years, the Navajos, on their side, agreeing to send all their children to the government schools until age 16, and for other subsidies in money or kind. The Navajos agreed to stay on their reservation and to occupy no other land, but were allowed to hunt elsewhere.

It is evident from the negotiations that the Navajos were not to be permanently disarmed, and could defend their reservation. They feared attacks by other Indian tribes, which they could repel, but pursuit and retaliation it was hoped they would refrain from, leaving that to the United States Army. The "bad men" clause dealing with wrongs *to* the Navajos is not confined to United States Government employees, but extends to "people subject to the authority of the United States." This vague phrase, to effectuate the purpose of the treaty, could possibly include Indians hostile to the Navajos whose wrongs to Navajos the United States will punish and

pay for: thus the need for Indian retaliation would be eliminated.[1] On the other hand, the "bad men" clause, dealing with depredations or wrongs by the Indians, provides for notice to the Indians, and an opportunity for them to deliver up the offender, and only on their failure to do this upon notice, is recoupment to be extracted from annuities due the Indians. "Indians" here means Navajo Indians, as the context makes clear.

The government asserts that the "bad men" clauses were virtually dead letters until recently, in the case of the Navajo, at least. The President never prescribed any "rules and regulations for ascertaining damages." Apparently, as we shall discuss more at length later, the portion dealing with wrongs or depredations by Indians (of the tribe with whom the treaty was made) was preempted by the Indian Depredation Act of March 3, 1891, 26 Stat. 851. In *Brown v. United States*, 32 Ct.Cl. 432 (1897), the Court of Claims put the proposition not, however, as preemption, but as an expression of opinion by the United States that the treaties were never from their inception intended to exonerate a tribe from its legal liability for depredations by its members on the grounds it had not been given notice, or if given notice, had not willfully failed to give up the offender. *Id.* at 436–38. This decision virtually nullified the aspect of the treaty that differed from other law to the Indians' advantage, as to their own depredations.

Apparently, so far as the parties to this case know, the clause relating to wrongs *against* members of a treaty tribe was first invoked in 1969 in *Hebah v. United States*, 192 Ct.Cl. 785, 428 F.2d 1334 (1970) (*Hebah I*). Hebah sued as administratrix to recover for the death of a Shoshone at the hands of an Indian policeman said to have been a "bad man" in the treaty sense. The government moved to dismiss on two specific grounds: (1) that the treaty did not create a right owing to individuals, but only to the tribe, and (2) that the suit was

---

**1.** This interpretation is documented from the "legislative history" discussed *infra* at pages 400–01.

unconsented. The holding was that Hebah was a third-party beneficiary of a contract, or else a direct beneficiary of an Act of Congress (construing that term to include treaties) and consent was given in 28 U.S.C. § 1491. *Hebah I,* 428 F.2d at 1338, 1340. (*Hebah I* says explicitly that the government raised no other defense than these two, 428 F.2d at 1340.) Those conclusions are not challenged in the present litigation. Subsequently, the Supreme Court has held that a treaty with an Indian tribe is a contract. *Washington v. Washington State Commercial Passenger Fishing Vessel Association,* 443 U.S. 658, 675, 99 S.Ct. 3055, 3069, 61 L.Ed.2d 823 (1979).

Hebah returned to the Court of Claims in 1972, *Hebah v. United States,* 456 F.2d 696, *cert. denied,* 409 U.S. 870, 93 S.Ct. 199, 34 L.Ed.2d 121 (1972) (*Hebah II*), at which time a divided court affirmed a trial commissioner's opinion and findings adverse to the claims on the merits. The parties here agree that the government attempted to assert to the commissioner a defense that article I of the treaty was obsolete and abandoned, but he refused to consider it because the assertion was untimely. The full court was aware this had occurred, but took no special notice of that defense.

*Begay v. United States,* 219 Ct.Cl. 599 (1979) (*Begay I*), involved a "wrong" to Navajo children by a government teacher. The court insisted on having an Interior Department report on the claims. In *Begay II v. United States,* 224 Ct.Cl. 712, 650 F.2d 288 (1980), *cert. denied,* 450 U.S. 1040, 101 S.Ct. 1758, 68 L.Ed.2d 238 (1981) (*Begay II*), the case was back again, with the report unfavorable to the claimants. The *Begay II* court assumes, without deciding, that the treaty gives a cause of action, but states that, if it does, the Interior Department decision is final unless shown to be arbitrary and capricious, unsupported by substantial evidence, or contrary to law. The court's reference to finality language in article I is apparently an inadvertent error. *Begay I,* requiring the report, cites only article I of the treaty as the source of Interior's duty to consider the facts and make a report, yet article I contains no finality language. We shall show, *infra,* that article IV is not pertinent to a claim of a wrong *to* a Navajo.

Plaintiff in the case now before us, Ms. Venita Tsosie, a Navajo, was admitted as a patient to the United States Public Health Service Hospital, which is within the Navajo reservation. On October 16, 1978, she complains, one Robert Freeman, a laboratory technician, but apparently posing as a doctor, conducted a medical examination on her body, including her vagina. It caused her physical injuries as well as embarrassment and humiliation, she alleges. She complained to a genuine doctor shortly thereafter and, on May 8, 1980, filed a claim under the Federal Tort Claims Act, 28 U.S.C. § 2671 and ff. On December 3, 1980, the Department of Health and Human Services rejected this claim, asserting an exemption from tort liability for assaults and batteries, 28 U.S.C. § 2680(h), and denying on the facts any negligence in employing Mr. Freeman. Instead of suing on the Tort Claims Act in the United States District Court, plaintiff next, on July 22, 1982, filed a claim under article I of the Navajo treaty. The Interior Department Assistant Secretary for Indian Affairs, on January 30, 1984, denied that claim. This denial is based wholly on the theory that article I of the treaty is obsolete, is no longer needed, and is therefore no longer in effect. The merits are not discussed at all.

On October 10, 1984, Ms. Tsosie filed the instant lawsuit, based on article I of the treaty, and on the Tucker Act, 28 U.S.C. § 1491, and claiming an award of $255,000, plus costs and attorney fees.

The decision appealed from is on a government motion for dismissal for failure to state a cause of action or, in the alternative, for summary judgment. The Claims Court denies the motion, but makes it clear it would be granted, but for the court's being constrained to hold otherwise by the Court of Claims authority above cited and summarized.

### Discussion

This panel is, of course, as much "bound" as Judge Yock was, or as little, by

the decisions of the Court of Claims in the *Hebah* and *Begay* cases. *South Corp. v. United States,* 690 F.2d 1368, 1 Fed.Cir. (T) 1, 215 U.S.P.Q. 657 (1982). Since this does not include being "bound" by our own unpublished precedents where, as here, *res judicata,* collateral estoppel, or law of the case are not involved (Fed.Cir.R. 18), it follows that, except in the instances named, matter unstated and undiscussed, underlying published decisions of the two predecessor courts, is not precedential. Thus, neither the court below, or ourselves, is "bound" to apply or reject the Interior Department's theory that the Navajo treaty, or at least all of article I thereof, is no longer in effect because no longer needed, which theory was not until too late urged upon the court in the *Hebah* case and, if at some point known to the judges, was never discussed. The theory, incidentally, is we believe a matter of defense to be asserted by the government, not a matter of subject-matter jurisdiction. If, *e.g.,* an allegation that a government contract supports a claim suffices for section 1491 jurisdiction, if the contract expired before the claim under it accrued, that is not a matter of subject-matter jurisdiction, but of the merits. Thus the Court of Claims was under no duty to consider *sua sponte* the alleged obsolescence of article I. With this preliminary, we proceed to consider the three novel defenses to Ms. Tsosie's claim that the government now asserts.

## I

The government obsolescence theory, as stated, takes three mutually inconsistent lines of argument. We discuss these in turn. *Brown v. United States,* 32 Ct.Cl. 432 (1897), seems to have done more than anything else to influence the government in its belief that the whole of article I of the treaty is lapsed and obsolete. The holding is unusual, almost unique, in completely reversing a previous decision at page 411 of the same volume, and handed down only three weeks earlier. The "reconsideration" must have been intensive indeed. The problem was that the Indian Depredation Act of 1891 attempted to dispose of a number of ancient claims by

settlers of the West, alleging that tribes ostensibly "at amity" with the United States had nevertheless committed depredations for which, under international law, the tribes were liable to pay compensation. As they had not done so, the statute called for the Court of Claims to ascertain the damages in suits against the United States, and any judgments against the United States were to be recouped, if possible, out of subsidies or annuities being paid the offending tribe. The United States was not liable unless the tribe was. The government, however, set up as a defense as to tribes parties to the nine 1868 treaties, that the tribes were not liable because they had not been notified as article I of the treaties would require, and were not given a chance to exonerate the tribe of money liability by surrendering the "bad man" who had done the evil deed. In the first opinion, Chief Justice Nott said this was a good defense. He was persuaded on reconsideration that it would paralyze recoveries under the 1891 Act. Nothing had ever been done to implement that part of the treaties, he said; they were absolute dead letters from the very start. Thus, by that decision, the "bad man" clause involved did not at some time become obsolete. Like some warships, it was obsolete before it was launched. He said he could not hold that the 1891 Congress intended to restore *ex post facto* a liability from which the tribes had once been freed. So he held that the Congress assigned a meaning to the treaties, not according to their language, but according to actual practice under them.

There are, however, in each treaty, two "bad men" clauses. One deals with liability of the treaty tribe for depredation by its members, and purports to improve the tribe's position by giving it an escape hatch from its liability as it would otherwise be. The other deals with an entirely separate matter, wrongs by the white side's "bad men" against a treaty tribe, and purports to give the tribe or a wronged member reimbursement from the federal treasury. While Justice Nott's court had been recently granted express jurisdiction over the

first class, in the 1891 Act, it was expressly denied jurisdiction of claims against the federal treasury "growing out of or dependent on any treaty stipulation entered into with foreign nations or with the Indian tribes" by Revised Statute § 1066 (1873). It is not reasonable to suppose Nott intended in the *Brown* second opinion to pass on a class of claims over which he had no jurisdiction and which were not in any way under the consideration of his court.

We assume the government is, however, correct in asserting that the archives reveal no instance before *Hebah* of a tribe, or a member of a tribe, prosecuting a claim upon the federal treasury under the clause dealing with wrongs of the white side's "bad men." This does not establish that the clause was a dead letter, like the other one. It could have motivated the prosecution of offenders, as the clause also requires. The government will not argue it never prosecuted anyone for a wrong against members of the treaty tribes. The clause could have had its desired indirect effect in inducing the Navajo, as well as other treaty tribes, to remain in amity and trust to the protection of the United States for their security. The government does not argue the clause *never* has had that effect, only that it ceased to at an early date. In *Sioux Tribe of Indians v. United States*, 86 Ct.Cl. 299, *cert. denied*, 306 U.S. 642, 59 S.Ct. 582, 83 L.Ed. 1042 (1938), and *Sioux Tribe of Indians v. United States*, 89 Ct.Cl. 31 (1939), treaty commitments to help Sioux seeking to become farmers with animals, seeds, etc., were held to expire within a reasonable time. We do not think those cases are comparable to this. In any event, the two "bad men" clauses are not Siamese twins, the demise of one of which would necessarily involve the other, as is implicit in the government argument.

The government would also have us hold that if the involved "bad men" clause was ever more than a dead letter, it ceased to be so when it ceased to be needed. That argument assumes the clause was once effective and does not fix a termination date with any precision. We know, of course, that the other 1868 treaty tribes did not all settle down and remain at peace with the United States, as the Navajo did, without interruption thereafter. The Indian country suffered from turmoil, banditry, and occasional open war during the remainder of the century. The government argument would have more force if it could show the Indian signers of the treaty reasonably expected it would expire when it became unnecessary. *Washington v. Washington State Commercial Passenger Fishing Vessel Association*, 443 U.S. at 676, 99 S.Ct. at 3069–70. Such an expectation, had it existed, might have been—but is not shown to have been—based on the structure of the treaty itself, or the negotiations leading up to the treaty. Besides peace, stated as a paramount object in article I, the treaty had other purposes and was meant to have a permanent impact on Navajo life. The Navajo were to surrender their previous land claims (article IX) and accept a new reservation as their own (article II). They were to become educated (article VI) and they were to be allottees of land (article V), which they would farm. The government would not argue that the Navajo should be ousted from their reservation because it is no longer needed to keep them at peace. It seems equally ungracious to say the Navajo must give up the portion that still remains of article I, proffered to keep them at peace, because they are at peace, and it is unlikely the Navajo signers could have so expected.

When the parties to the treaty wished a provision to be in effect temporarily only, they knew how to say so. Thus article VI was to "continue for not less than ten years."

Under all the circumstances, an understanding that the rights under article I were not permanent cannot be imputed to the Indian signers, and in the absence of such understanding, short of later impossibility or preemption, we do not think the surviving portion of article I can be deemed to have expired. Prolonged nonenforcement, without preemption, does not extinguish Indian rights. A recent dramatic example of this is *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985) (rights not

enforced from accrual of action in 1795 to suit filed in 1970). The dissent at 255, vehemently argues that some law, the doctrine of laches if nothing else, must have barred this claim slept on for so long. Even the dissent, however, recognizes that the situation of Indians as wards of the state, and under disability, may affect some tolling. In this case, while Revised Statute § 1066 as quoted above, was in effect, the Indians could not have taken claims to court. As to an administrative claim, a Navajo would have had to pursue it through the Indian agent to the Commissioner of Indian Affairs. It might appear these facts account for the absence of claims: we do not know on the present record. In any event, the government relies too much on mere failure to enforce as a defense.

While Justice Nott avoided saying the Indian Depredation Act of 1891 preempted the treaty rights of the Indians respecting depredation by them, it is clear he did not think the statute and the treaty could operate together, and a more modern court would not hesitate to call it preemption. Nott lacked in 1897 the light of *Lone Wolf v. Hitchcock*, 187 U.S. 553, 566, 23 S.Ct. 216, 221, 47 L.Ed. 299 (1903) holding that Congress can constitutionally abrogate Indian treaty rights. With respect to wrongs by the white side's "bad men" against treaty Indians, the absence of any preemption is in sharp contrast. The government's brief points out various factors to lessen the Indian's need for the surviving "bad men" provision: their access to regular courts, their citizenship, the powers of their own tribal courts. The Federal Tort Claims Act, 28 U.S.C. § 2671 and ff has been, since 1946, a notable change, but it cannot seriously be argued to constitute preemption. As this very case illustrates, it does not provide for assaults and batteries, the very type of "wrong" most needing to be guarded against by the "bad men" provision. In addition, the "bad men" provision is not confined to "wrongs" by government employees. The literal text of article I and the "legislative history" of the treaty show that any "white" can be a "bad man" plus any nonwhite "subject to the authority of the United States," whatever that means, but most likely Indian nonmembers of the Navajo tribe but subject to United States law.[2] This difference in the breadth of the Tort Claims Act and the "bad man" clause of the Navajo treaty is further evidence that the Tort Claims Act, which addresses certain acts of government employees, is of a different nature and has not preempted the treaty, which concerns wrongs to Navajos by others than government employees also. It is unlikely that Congress intended the Tort Claims Act, or the statutes relating to military records, 10 U.S.C. § 1552, and Indian claims, 28 U.S.C. § 1505, to preempt the Navajo treaty because these 1946 acts were court *opening*, intended to eliminate the private bill system by judicial procedures. *See* Legislative Reorganization Act of 1946, ch. 753, § 131, 60 Stat. 831 (banning private bills). It would be ironic to conclude that Congress both opened and closed the courts to Indians at the same

---

**2.** The legislative history of the Navajo treaty suggests that the bad man clause relating to wrongs to Navajos applied to such wrongs by all whites and nonwhites subject to United States jurisdiction. Lt. General Sherman, during the "council proceedings" with the chiefs and head men of the Navajo tribe, suggested the meaning of "nonwhites" in the following statement during the negotiations:

> If you will live in peace with your neighbors, we will see that your neighbors will be at peace with you—The government will stand between you and other Indians and Mexicans.

Joint App. at 59.

The 1869 report of the Indian Peace Commission refers indirectly to the meaning of "whites" in the treaty:

> [I]f settlers and railroad men will treat Indians as they will treat whites under similar circumstances, we apprehend but little trouble will exist. They must acquaint themselves with the treaty obligations of the government, and respect them as the highest law of the land.

Joint App. at 193.

The treaty was between two nations, and each one promised redress for wrongs committed by its nationals against those of the other nation. Except for the "bad man" clause, there is no part of the treaty to which Sherman could have referred.

time. Since Ms. Tsosie was turned down when she applied for Tort Claims Act relief, reference to it even as a substitute relief is inappropriate. As to preemption: "the intention to abrogate or modify a treaty right is not to be lightly imputed to the Congress." *Menominee Tribe of Indians v. United States,* 391 U.S. 404, 413, 88 S.Ct. 1705, 1711, 20 L.Ed.2d 697 (1968). Absent explicit statutory language, the Court has "been extremely reluctant to find congressional abrogation of treaty rights." *Washington State Commercial Passenger Fishing Vessel Association,* 443 U.S. at 690, 99 S.Ct. at 3077.

Essentially, we are asked to pronounce *finis* to a treaty right, with no showing it has expired by its own express or implicit terms, or was abrogated by consent of the parties, or by Congress unilaterally. It is an inappropriate role for the judiciary: *Lone Wolf,* 187 U.S. at 567, 23 S.Ct. at 222, says it is a function of the "legislative power."

## II

The defendant also contends that the nine treaties were not self-executing, that is, to be an effective support for a money claim against the government a treaty must be implemented by domestic legislation. This need not detain us long. Revised Statute § 1066 provided that the Court of Claims had no jurisdiction over money claims based on treaties with foreign nations or Indian tribes, as did later counterpart United States Code provisions: however, by the Act of May 24, 1949, ch. 139, § 88, 63 Stat. 102, the words "with Indian tribes" were stricken. As more fully explained in *Hebah,* 428 F.2d at 1338, 1340, the outcome is that an Indian tribe can sue on a treaty under 28 U.S.C. § 1505 and an individual Indian can sue under 28 U.S.C. § 1491 and base the claim in either case on an Indian treaty, though not on a treaty with a foreign government. If such a suit results in a money judgment, funds to pay it are appropriated in 31 U.S.C. § 1304(a)(3)(A). These provisions were manifestly intended to be read with Indian treaties and to remove any impediment of a

jurisdictional nature to enforcement by the Claims Court of any claim to a money payment properly based on an Indian treaty viewed as a species of contract. It is no longer necessary to deal with any difficulties arising from cases decided before the above provisions became law.

## III

Defendant also urges an absence of consent to the suit, under section 1491, because of the provision in article IV which says that "In all cases of depredation on person or property * * * [the decision of the Commissioner of Indian Affairs] shall be binding on the parties to this treaty." According to Webster's Unabridged, a depredation is "an act of plundering, despoiling, or making inroads." Webster's Third New International Dictionary 606 (1968). The text of article IV is such as to suggest that such depredations are part but not all of the "matters of complaint by or against the Indians." The wording is needlessly clumsy on any other interpretation. It is also to be noted that in article I, the white side's "bad men" only commit "wrong[s]" whereas Indian "bad men" commit "wrong[s] or depredation[s] upon the person or property of any one * * *." There certainly appears to be ground for the plaintiff's argument, that in the semantics of the treaty writers, only Indians committed depredations, whereas wrongs by whites, though real, went by some other name. Moreover, in the case of complaints by the treaty Indians, it seems incongruous that an official of one Executive Department, Interior, should finally determine the liability of other government agencies for torts by their employees. For example, as the Navajo had been prisoners of the United States Army since 1863, since the leading "Peace Commissioner" who made the treaty, Lt. General Sherman, was an active duty Lt. General in the Army, and a majority of the attesting witnesses, six out of eight, were Army officers, it is reasonable to suppose personnel of the Army were most conspicuous among the government employees with whom the Navajos had contact, and any alleged "wrongs" committed

by anyone would likely be committed by soldiers in the immediate future. Are we then to suppose that they intended an Interior Department official to determine their liability for alleged torts without appeal to any other authority? If we are to assume that only Indians committed "depredations," this incongruity disappears.

By article I a "bad man" of the white side was to be arrested and punished according to law. He would presumably have constitutional rights and, as to any finding by the Commissioner, he would be a nonparty and not bound. From this source too would rise an incongruity if, semantically, one supposes he committed a "depredation."

However, we believe that if any "depredations," in the article IV sense, could be considered committed by the white side, contrary to these indications, the Tucker Act itself, as amended in 1949, preempts a treaty restriction making claims nonjusticiable. As the 1949 Acts were in relief of Indians, and removed their disabilities, the judicial reluctance to find preemption of treaty rights would not obtain.

Judge Yock cites *Lindahl v. Office of Personnel Management*, 470 U.S. 768, 105 S.Ct. 1620, 84 L.Ed.2d 674 (1985), *Dunlop v. Bachowski*, 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975), and *Sanders v. United States*, 219 Ct.Cl. 285, 594 F.2d 804 (1979), in support of an asserted general proposition that parties will not be precluded from judicial review in the absence of "clear and convincing evidence" of an intent to deny at least limited judicial review on the part of the lawmaker. We agree with him that such "clear and convincing evidence" is lacking here. We have tried to give the treaty, article IV, the same kind of scrutiny given the very different laws and circumstances involved in the three cases cited. The issue resists resolution by resort to broad general principles alone. Perhaps it suffices that the government would need a far more convincing and one-sided showing than in fact it makes, in order to carry this point. At most, it raises an ambiguity.

IV

The trial court, having reluctantly decided it was bound by the *Hebah* and *Begay* cases to hold the "bad men" clauses remained effective, and having, by its own reasoning rejected the other government threshold defenses discussed above, reversed the previous decision of the Assistant Secretary of Interior for Indian Affairs, and remanded the case to him for a "final administrative decision on the merits." The court directed the Assistant Secretary to issue his final decision within 180 days. This order has been stayed, but presumably will now be in effect. The court stated he elected to follow for procedure the *"Begay I"* decision, which refers to article I of the treaty as its authority, but the published opinion in *Begay I* does not contain any statement as to how the conclusions of the Assistant Secretary are to be reviewed: Judge Yock purports to discover a "substantial evidence" standard therein, but we are unable to do so.

The statements about the standard of review in *Begay II* seem, as stated above, to reflect confusion between treaty article I and article IV and, in any case, they are dictum. The court's action was to uphold a government motion to dismiss on the ground of failure to exhaust the administrative remedy. In coming to this conclusion, the court relied on repeated failures by the claimants to present their claims in the manner the Interior Department called for. "All told, these multiple derelictions amount to a virtual failure to prosecute * * *." *Begay II*, 224 Ct.Cl. at 716, 650 F.2d 288.

The certification directed our attention to the obsoletion issue only, but we have seen fit to consider the government's other threshold defenses also. Our review stops there. We do not think that on this interlocutory appeal we should attempt to anticipate what the Interior Department report will say, what the positions of the parties will be respecting it, or what procedure will be appropriate to fulfill the Tucker Act responsibilities of the Claims Court between receipt of the report and final judgment.

*Conclusion*

It is asking the wrong question to ask if article I of the Navajo Treaty of 1868 is obsolete. The right question is whether it is preempted. That it is preempted in part as to "depredations" by Indian members of a tribe is admitted. The portion dealing with "wrongs" against members of the tribe we conclude is not preempted and is still in effect. So far as, originally, the treaty was not self-executing as to money claims thereunder, the defect was cured in 1949. The finality language in article IV never did apply except to claims against Navajo Indians for "depredations" but, if it ever did, it has also been preempted. Thus, the government's threshold defenses fail it and the case should be proved on the merits. On the basis of these conclusions, the decision below is affirmed and the case is remanded for further proceedings in accordance with this opinion.

AFFIRMED AND REMANDED FOR FURTHER PROCEEDINGS