LOURIE, Circuit Judge,
dissenting.
I respectfully dissent from the majority’s decision to vacate and remand the United States Court of Federal Claims’ (“Claims Court”) dismissal of the claim in this case.
The Claims Court concluded that the “bad men” provision from the Fort Laramie Treaty of 1868 does not render the United States liable for wrongs committed by those who are not “subject to the authority of the United States”—ie., employees, agents, or representatives of the United States or otherwise acting upon the United States’ behalf. Richard v. United States, 98 Fed.Cl. 278, 290 (2011). As the drank driver in this case was not such a person, the Claims Court dismissed the case for lack of jurisdiction. I would affirm that decision.
There is a tension here between wraiver of sovereign immunity and construction of treaties with the Indians. On the one hand, waivers of sovereign immunity, including the Tucker Act, must be narrowly construed. Radioshack Corp. v. United States, 566 F.3d 1358, 1360 (Fed.Cir.2009). On the other hand, we also construe discrepancies in favor of the Native Americans without extending the treaty beyond its bounds in order to meet varying alleged injustices. Minnesota v. Mille Lacs Band of Chippewa Indians, 526 U.S. 172, 200, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999) (citations omitted). The Supreme Court recently noted in Cooper that “a waiver of sovereign immunity must be ‘unequivocally expressed’ ” and “[legislative history cannot supply a waiver that is not clearly evident from the language.” Fed. Aviation Admin. v. Cooper, — U.S.-, 132 S.Ct. 1441, 1448, 182 L.Ed.2d 497 (2012) (citations omitted). “Any ambiguities ... are to be construed in favor of immunity so that the Government’s consent to be sued is never enlarged beyond what a fair reading of the text requires.” Id. (citations omitted). The Supreme Court added that such “[ajmbiguity exists if there is a plausible interpretation of the statute that would not authorize money damages *1154 against the Government.” Id. “We also construe any ambiguities in the scope of a waiver in favor of the sovereign.” Id. In that event, the “scope of Congress’ waiver [must] be clearly discernable” and “[i]f it is not, then we take the interpretation most favorable to the Government.” Id. In this case, in my view, the scope of Congress’ waiver is not clearly discernable in the treaty and the balance therefore rests on the side of sovereign immunity.
A treaty with an Indian tribe is a contract, and it should be interpreted to give effect to the intent of the signatories. Washington v. Wash. State Comm. Passenger Fishing Vessel Ass’n, 443 U.S. 658, 675, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979) (“A treaty ... is essentially a contract between two sovereign nations.”); Santovineenzo v. Egan, 284 U.S. 30, 40, 52 S.Ct. 81, 76 L.Ed. 151 (1931); Tsosie v. United States, 825 F.2d 393, 397 (Fed.Cir.1987). In discerning the intent of the signatories to a treaty, we look to the parties’ “choice of words” and the “larger context that frames the treaty, including ‘the history of the treaty, the negotiations, and the practical construction adopted by the parties.’ ” Minnesota, 526 U.S. at 196, 119 S.Ct. 1187 (quoting Choctaw Nation v. United States, 318 U.S. 423, 432, 63 S.Ct. 672, 87 L.Ed. 877 (1943)); see also Medellin v. Texas, 552 U.S. 491, 507, 516-517, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008) (considering pos-tratification understanding of the parties); El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng, 525 U.S. 155, 167, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999) (same). In this fashion, treaties are construed “to give effect to the terms as the Indians themselves would have understood them.” Minnesota, 526 U.S. at 196, 119 S.Ct. 1187; Choctaw Nation v. Oklahoma, 397 U.S. 620, 631, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970).
The Claims Court thoroughly reviewed the historical context surrounding the Fort Laramie Treaty of 1868, including both the Indian Peace Commission Report of 1868 and the Doolittle Commission Report from 1867 cited by the majority. The Claims Court, quoting the Doolittle Commission Report, concluded that:
The Doolittle Commission observed that “useless wars with the Indians” could “be traced to the aggressions of lawless white men, always to be found upon the frontier.” The “lawless white men” to which [Doolittle Commission Report] referred were apparently United States soldiers, who engaged in the “indiscriminate slaughter of men, women, and children .... ”
Richard, 98 Fed.Cl. at 285 (citations omitted). The court then listed a number of entries in the Doolittle Commission Report describing massacres, butchering, and murder by United States soldiers. Id. The Doolittle Commission Report also noted that it was “difficult if not impossible to restrain white men, especially white men upon the frontiers from adopting [savage] warfare against the Indians.” Id. (emphasis added). Consequently, as the court noted, the Doolittle Commission Report recommended that Congress establish five boards of inspection of Native American affairs that would, among other things, inquire into conduct of the military toward tribes in order to “preserve peace and amity.” Id. (citations omitted).
Similarly, the Indian Peace Commission Report, as the court also pointed out, likewise noted the difficulty of containing all of the Indian Tribes’ complaints:
In making treaties it was enjoined on us to remove, if possible, the causes of complaints on the part of the Indians. This ■would be no easy task. We have done the best we could under the circumstances .... The best possible way then to avoid war is to do no act of injustice. When we learn that the same rule holds *1155 good with Indians, the chief difficulty is removed. But it is said our wars with them have been almost constant.
Id. (emphasis added). In an effort to settle this conflict, the United States entered into nine treaties between various hostile Indian tribes in the United States, including the Fort Laramie Treaty. Id. at 282.
The majority opinion focuses on the accounts in the Doolittle Commission Report’s of atrocities by civilians. Majority Op. at 1147-50. But just because the Doolittle Commission Report listed those acts does not mean the treaty was intended or understood to prevent all of them, especially in light of the same reports noting the difficulty of such a task. Indeed, the Doolittle Commission Report is not legislative history; it is historical context. In other words, the historical record stands for two propositions: (1) atrocities were committed by U.S. soldiers and civilians; and (2) controlling civilians would be difficult if not impossible.
Given this historical backdrop, one must discern the meaning of the phrase “bad men among the whites, or among other people subject to the authority of the United States” as the parties themselves would have understood it, informed by the practical construction adopted by the parties. See Minnesota, 526 U.S. at 196, 119 S.Ct. 1187. In the over 144 year history of the Fort Laramie Treaty, neither party nor the majority has been able to identify a single case brought by an Indian individual against a “white” person who was not an employee, agent, representative of the United States or otherwise acting upon the United States’ behalf that has been found liable and upheld by any appellate or district court. Instead, as the Claims Court pointed out, the “bad men” line of cases points to one common thread: “the court possesses jurisdiction over Article I ‘bad men’ clause claims where there exists a nexus between the individual committing the alleged ‘wrong’ and the United States.” Id. at 289.
As the court showed, in each of the cases, the bad men were individuals (“white” or “other people”) who were “subject to the authority of the United States” in some capacity. Id. at 289-90; see, e.g., Tsosie, 825 F.2d at 397 (involving a United States Public Health Service Hospital employee); Begay v. United States, 219 Ct.Cl. 599 (1979) (teachers, both white and Native American, who were employed at a Bureau of Indian Affairs school); Hebah v. United States, 456 F.2d 696 (Ct.Cl.1972) (Indian Police Force officer subject to the authority of Department of the Interior); Elk v. United States, 70 Fed.Cl. 405 (2006) (U.S. Army staff sergeant). In fact, the earliest ease brought against a person unaffiliated with the Federal government appears to be Hernandez in 2010, which was dismissed for lack of subject matter jurisdiction because he was not a federal employee. Hernandez v. United States, 93 Fed.Cl. 193, 200 (2010) (involving an officer who was employed by WING, a non-federal agency). The sound reasoning of the Claims Court derived from these cases has already been independently followed at least by one other U.S. District Court. Banks v. Guffy, No. 1:10-CV-2130, 2012 WL 72724, *7 & n. 10 (M.D.Pa. Jan. 10, 2012) (slip copy).
In the interim century and a half since the treaty was signed, there have undoubtedly been wrongs committed against the Sioux by white, non-government men. The complete dearth of cases brought against non-government “whites” testifies to a practical construction adopted by the parties over an exceedingly long period of time, evidence that the Sioux and the United States did not intend that this agreement cover persons not affiliated with the United States government. The “bad *1156 men” cases support this understanding. It is not for us to in effect create a new remedy in the Claims Court, as the majority does, that neither the courts nor the Sioux contemplated for over 140 years, and for which the government has not waived sovereign immunity.
The majority relies on the following passage from Tsosie as constituting a holding and controlling our interpretation of the “bad men” provision:
[T]he “bad men” provision is not confined to “wrongs” by government employees. The literal text of article I and the “legislative history” of the treaty show that any “white” can be a “bad man” plus any nonwhite “subject to the authority of the United States,” whatever that means, but most likely Indian nonmembers of the Navajo tribe but subject to United States law.
Tsosie, 825 F.2d at 400. However, a plain reading of this statement is merely that the “bad men” provision is broader than government employees. It does not define the outer limit. Indeed, the “bad man” at issue in Tsosie was a government employee at a United States hospital. Id. at 397. Thus any broader interpretation was not a holding, but was dictum. Likewise, we did not define “whites” or rule whether the term “whites” was modified by “subject to the authority of the United States.” We declined to do so, and simply noted the ambiguity of the phrase “subject to the authority of the United States.” Id. at 400 (“whatever that means”). In contrast to Tsosie, this case turns on the outer limit of “whites” and “subject to the authority of the United States.”
The majority also quotes Tsosie as stating: “We hold ... that the treaty provision in question [the “bad men” provision of Art. 1], even if infrequently invoked, has not become obsolete or been abandoned or preempted in any sense that affects its enforceability by suit in the Claims Court under the Tucker Act, 28 U.S.C. § 1491.” Majority Op. at 1150. Again, such is not a holding that the “bad men” provision is not limited to government aetors, given the fact that the offending white party in Tso-sie was a United States government employee, i.e., a government hospital employee. Instead, it merely holds that the “bad men” provision is still generally enforceable under the Tucker Act, which is not questioned in this appeal.
The majority is correct that we noted in Tsosie that “[prolonged nonenforcement, without preemption, does not extinguish Indian rights.” Tsosie, 825 F.2d at 399. But the Claims Court did not hold that the “bad men” provision is no longer enforceable. Instead the Claims Court stated that the United States and the Sioux did not intend that the “bad men” provision cover those who are not employees, agents, or representatives of the United States or otherwise acting upon the United States’ behalf. That is distinct from whether treaty rights have been abrogated by nonenforcement as discussed in Tsosie.
The majority gives much weight to the use of “subject to the authority of the United States” in the second “bad men” clause. Majority Op. at 1146-48. In particular, the majority argues that it makes “little sense” to have the terms of the Treaty limited to acts committed by Indians against “anyone, white, black, or Indian, [who are government actors], and at peace therewith.” Majority Op. at 1147. Instead, the majority suggests that the term “subject to the authority of the United States” could likely mean “persons governed by U.S. law.” Majority Op. at 1146. But it would make even less sense for the United States to be involved with citizens of one Indian nation committing a wrong against a citizen of another Indian nation, as the majority’s view would suggest. As *1157 the government notes, the phrase “at peace therewith” immediately follows “subject to the authority of the United States.” The United States was not at war with its own citizens in 1868. The logical conclusion is that “subject to the authority of the United States” (and “at peace therewith”) as used in the second “bad men” clause only modifies “Indians.”
As noted by the majority, the comma placement between “whites, or among other people” is inconclusive as an interpretive aid in the context of the particular phrase here. Majority Op. at 1145-46 n. 8. Given the comma ambiguity, it is, therefore, equally as likely that the drafters intended both categories, “whites” and “among other people” to be modified by “subject to the authority of the United States” while avoiding unnecessary repetition. In other words, while the phrase could have been written: “whites, subject to the authority of the United States, or among other people, subject to the authority of the United States” the drafters could have easily discarded the unnecessary sur-plusage and ended with: “whites or among other people, subject to the authority of the United States” as in the Fort Laramie Treaty as signed.
I would take judicial notice of what may well be the original version of the treaty, obtained from the National Archives, which contains the comma after “among other people.” See National Archives, Sioux Treaty of 1868, http://www.archives. gov/edueation/lessons/sioux-treaty/images/ sioux-treaty-l.jpg (last visited Apr. 11, 2012). That would lead to the conclusion, as discussed above, that “subject to the authority of the United States” was meant by the parties to modify both “whites” and “among other people,” supporting the interpretation that “whites” had to be subject to the authority of the United States government for liability to apply. Even so, given the ambiguity in the text, the historical context and the practical construction adopted by the parties over the following century and a half are needed to inform us what was intended by the parties.
As discussed above, the historical context of the treaty and the practical construction adopted by the parties in the intervening 140 years of its enforcement all suggest that it is unlikely that the federal government would broadly have waived sovereign immunity, opened its coffers, and, as the Claims Court stated, agreed to the impossible task of guaranteeing the safety and tranquility of all Native Americans on reservations from any and all of their interactions with anyone. In other words, the signatories, including the Indians themselves, would have understood “bad men among the whites, or among other people subject to the authority of the United States” to mean “employees, agents, or representatives of the United States or otherwise acting upon the United States’ behalf.”
I finally note that the plaintiffs are not without an avenue for redress. The briefing before us represents that the plaintiffs are currently pursuing damages against the drunk driver. In any event, I see no reason to reverse the trial court, which decided the case correctly. I therefore respectfully dissent.