Nott, Oh. J.,
delivered the opinion of the court:
The defense in this case rests upon certain facts, which are thus summarized by the special agent of the Interior Department who investigated the case:
“The claimant is intermarried with the Sioux, and has lived the greater part of his life with them and in their country. He now resides at the Pine Bidge Agency, where his family are enrolled as members of the Sioux Nation, but personally he does not participate in the distribution of rations or annuity goods. He is one of the old ‘mountaineers,’ or ‘men of the country,’ as they were called, who claim to have been adopted by the Sioux and to have been legally incorporated into that nation by the Sioux treaty of 1868; and it was by virtue of this adoption and incorporation that he was living at the Whetstone Agency at the time that he claims that his cattle were killed.”
The position of the defendants upon this point is that a “squaw man,” being one who has been adopted into an Indian tribe, can not maintain an action for the loss of property taken by the tribe of which he was at the time a member. . On the part of the claimant it has been argued at great length and with great earnestness that a citizen of the United States, though adopted by and living with an Indian tribe, still remains a citizen, subject to the criminal laws of the United States (United States v. Rogers, 4 How., 567), and therefore should not be deprived of the rights of one.
It is contended by the counsel for the claimant that the testimony of the claimant somewhat modifies the statement of the agent. This testimony'shows that he was employed in 1868 by General Auger, one of the Peace Commissioners, to accompany the Commission as interpreter; that at the close of their negotiations he was directed to select a place for the new *409 agency and for tbe Indians that were to be removed to the Missouri River, and that he selected Whetstone. It also shows that he was subsequently directed by General Harney to go to Fort Laramie and bring thence to the Whetstone Reservation a party of Indians, which he did; and that he moved with his family and his cattle at the approach of winter four or five miles out from the agency upon the reservation, where the depredation complained of occurred during the ensuing winter. This testimony is sustained by the treaties, which show that “Nicholas Janis, interpreter,” signed as one of the attesting witnesses on the 29th April, 1868, the 25th May, 1868, and the 6th November, 1868. (15 Stat. L., 641.) But it also appears by his testimony that he had been paid off and discharged as an employee of the United States before the depredation occurred; and it does not appear that after the stress of winter had passed he removed from the reservation and changed his place of residence. In other words, it appears that the statement of the agent is confirmed so far as relates to the domicile of the claimant; that he was a “squaw man” permanently domiciled among the defendant Indians, and, at the time, living with them by virtue of the rights of his Indian wife upon their reservation.
The Sioux treaty, 25th April, 1868 (15 Stat. L., 635, art. 1), provides, on the one hand, that “ if bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians” the United States will, among other things, “reimburse the injured person for the loss sustained,” and, on the other hand, that “if bad men among the Indians shall commit a wrong or depredation upon the person or property of anyone — white, black, or Indian — subject to the authority of the United States and at peace therewith, the person injured shall be reimbursed for his loss from the annuities or other moneys due or to become due to them.” The terms “white, black, or Indian” are certainly comprehensive enough to include a “squaw man,” and it must be conceded that if a “squaw man” is a citizen of the United States that fact is sufficient to give the court jurisdiction of his case. ■ The benefits of this jurisdiction are restricted to those who are citizens and withheld from those who are aliens; yet it does not follow that every claimant who is a citizen is a claimant who can maintain a liability against the United States.
*410 The general principle is that an alien while domiciled in a country owes to it a local and temporary allegiance, which continues during the iieriod of his residence, in return for the protection which he receives. The Supreme Court carried this so far as to hold that for a breach of this temporary allegiance an alien domiciled within the United States during the civil war became a participator in the personal responsibilities of the time, and therefore entitled, like a citizen, to the benefits of the proclamation of general amnesty. (Carlisle and Hendersons Case, 16 Wall., 147.) So, too, it has been held by this court that where American merchants carried their goods into places under the protection of a foreign power the subsequent seizure of their goods by a belligerent was a wrong which the United States were not bound to redress. (Leghorn Seizures, 27 C. Cls. R., 224.)
The general purpose of the Indian indemnity acts, as has been said frequently, was to keep the peace. They contemplate that the Indians shall be responsible for what Indians do within the white man’s territory and that the Government will be responsible for what white men do within the Indian’s territory. They make an exception in the case of a white man lawfully and temporarily within the Indian Territory, but the exception proves the rule, and leaves it clearer that the responsibility of the Indians, within the intent and meaning of all the statutes, is for the wrongs which they do outside of their own people and proper habitat.
The term “Indian” in the provision above quoted has no more signification than the terms “white” and “black.” If the person whose property was taken was a person “ subject to the authority of the United States,” as distinguished from being a person subject to the authority of the Sioux Nation, it was immaterial whether he was “ white,” or “ black,” or “ Indian.” In a somewhat remarkable case, United States v. Perryman (100 U. S., 235), the Supreme Court has held that the term “ a white person” in section. 16 of the act of 1834 (section 2154 of the Revised Statutes) does not include a black man. That is to say, the Supreme Court has held of a crime perpetrated by a black man in the Indian country in stealing the property of a friendly Indian, amid circumstances which would have rendered the Government liable if the perpetrator had been a whiteman, that the Government is not liable; and *411 that for such a depredation a friendly Indian can not recover, though the black man was a citizen of the United States. The treaty is more comprehensive than the act of 1834. It provides against depredations both by whites and by “ other persons subject to the authority of the United States;” and conversely it holds the Indians liable for a depredation upon the person or property of anyone “ subject to the authority of the United States,” be he “white, black, or Indian.” But there isno statute and no treaty by virtue of which the United States can hold an Indian tribe responsible for property stolen or destroyed by one of themselves and within their own borders.
The court does not intend to define a “ squaw man” within the intent of the Indian treaties nor to determine what are his rights and privileges, nor to decide whether by becoming a “ squaw man” he extinguishes the rights and privileges of an American citizen. It places the decision in this case entirely upon the fact of domicile. The principle which governs it is that when a citizen of the United States carries his property voluntarily into the Indian country, makes the home of the Indians his home, casts in his lot as a resident with them, he becomes subject, so far as his property is involved, to the risks of a natural-born Indian, and to that extent must be' considered as one of the tribe. The Indians as a tribe are not liable to him merely because he is a citizen of the United States; and the United States do not guarantee him against losses which result from his having voluntarily carried his property within the area of the Indians’ tribal jurisdiction.
The judgment of the court is that the petition be dismissed.