# United States Court of Appeals for the Federal Circuit

---

**JAMES RICHARD, SR., (PERSONAL REPRESENTATIVE OF THE ESTATE OF CALONNIE D. RANDALL, DECEASED), AND JON WHIRLWIND HORSE, (PERSONAL REPRESENTATIVE OF THE ESTATE OF ROBERT J. WHIRLWIND HORSE, DECEASED)**
*Plaintiffs-Appellants,*

v.

**UNITED STATES,**
*Defendant-Appellee.*

---

2011-5083

---

Appeal from the United States Court of Federal Claims in Case No. 10-CV-503, Judge Margaret M. Sweeney.

---

Decided: April 13, 2012

---

JAMES D. LEACH, of Rapid City, South Dakota, argued for plaintiffs-appellants.

J. HUNTER BENNETT, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-

appellee. With him on the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director and BRYANT G. SNEE, Deputy Director.

———————————

Before LOURIE, LINN, and WALLACH, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* WALLACH.
Dissenting opinion filed by *Circuit Judge* LOURIE.

WALLACH, *Circuit Judge*.

## INTRODUCTION

The United States Court of Federal Claims ("Claims Court") held that a drunk driver who killed two Sioux men on a Sioux reservation was not a "bad man" within the meaning of the 1868 Laramie Treaty, and that in any event, the relevant provisions of the Treaty are no longer enforceable by its beneficiaries. Considering our textual analysis, and because we held in *Tsosie v. United States*, 825 F.2d 393, 395 (Fed. Cir. 1987), the "bad men" provisions ("'bad men' provisions") of the Fort Laramie Treaty of 1868 ("the Laramie Treaty") are not limited to persons acting for or on behalf of the United States, and because the Claims Court's textual analysis and its historical recitations are erroneous or incomplete, the Claims Court improperly dismissed Appellants'[1] Complaint for lack of jurisdiction. Accordingly, we vacate and remand for further proceedings.

## BACKGROUND

———————————

[1]    Appellants are James Richard, Sr. (personal representative of the estate of Calonnie D. Randall, deceased) and Jon Whirlwind Horse (personal representative of the estate of Robert J. Whirlwind Horse, deceased).

In 1868, the Laramie Treaty was negotiated between "different tribes of Sioux Indians" and "commissioners, on the part of the United States." Laramie Treaty, 15 Stat. 635, 635 (1868).[2] "The United States treaty commissioners included that famed and redoubtable warrior, Lt. General William T. Sherman." *Tsosie*, 825 F.2d at 395. Article I of the Laramie Treaty as found in 15 Stat. 635 contains two "bad men" provisions and reads in part:

> *If bad men among the whites*, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs at Washington city, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also reimburse the injured person for the loss sustained.
>
> *If bad men among the Indians* shall commit a wrong or depredation upon the person or property of any one, white, black, or Indian, subject to the authority of the United States, and at peace therewith, the Indians herein named solemnly agree that they will, upon proof made to their agent and notice by him, deliver up the wrong-

---

[2]    The Treaty "established the Great Sioux Reservation, which comprised most of what is now western South Dakota and part of North Dakota." *South Dakota v. Bourland*, 508 U.S. 679, 682, 113 S. Ct. 2309, 124 L. Ed. 2d 606 (1993). Additionally, this treaty "is one of nine made in 1868 . . . . The treaties were all duly ratified, proclaimed, and published in volume fifteen of the *Statutes at Large*. All say that peace is their object and all contain 'bad men' articles in similar language." *Tsosie*, 825 F.2d at 395.

doer to the United States, to be tried and pun-
ished according to its laws; and in case they wil-
fully refuse so to do, the person injured shall be
reimbursed for his loss from the annuities or other
moneys due or to become due to them under this
or other treaties made with the United States.

15 Stat. 635, 635 (emphasis added).

On August 27, 2008, two members of the Oglala Sioux
Tribe, Calonnie Randall and Robert Whirlwind Horse,
were killed on the Pine Ridge Indian Reservation by
Timothy Hotz, a non-Sioux,[3] who was driving while
intoxicated. *Richard v. United States*, 98 Fed. Cl. 278, 280

---

[3] The Government's Brief states that one of two is-
sues in the case is whether the applicable "bad men"
provision "obligates the United States to compensate
members of the Sioux tribe for a 'wrong' committed by a
*white man* who was not [acting for or on behalf of the
United States]." Appellee's Brief at 2 (emphasis added).
In its Motion to Dismiss below, the Government stated "it
is clear that the 'bad men' provision was designed to
maintain the peace between the United States and the
Sioux by curbing the heinous acts of aggression perpe-
trated against the tribe by *white men*." Defendant's Mo-
tion to Dismiss at 10, *Richard v. United States*, 98 Fed.
Cl. 278 (2011) (No. 6) (emphasis added). The assumption
in the emphasized language is fundamentally flawed.
The language of the Laramie Treaty and pertinent his-
torical facts show "bad men among the whites, or among
other people subject to the authority of the United States"
was neither limited to bad white men nor to bad white
governmental actors. *See* discussion *ibid* at 11 n.9. The
Government conceded in oral argument that the language
of the Treaty is not limited to "whites" or to "men" al-
though it still pursues its governmental actors' argument.
Oral       Arg.       11:54-13:16,       available       at
http://oralarguments.cafc.uscourts.gov/mp3/2011-
5083.mp3 (Feb. 9, 2012).

(2011). Hotz pled guilty to involuntary manslaughter in the United States District Court for the District of South Dakota and was sentenced to federal prison for 51 months. *Id.*[4] Appellants filed a complaint with the Claims Court alleging that under the relevant "bad men" provision in the Laramie Treaty, Hotz's actions were a "wrong" against Native Americans, Hotz was a "bad man" under the treaty, and the United States therefore must reimburse the injured parties for losses sustained as a result of "wrong" actions by a "bad man" against Sioux tribal members on their reservation. *Id.*[5]

The jurisdiction of the Claims Court was invoked pursuant to (1) the Tucker Act, which waives sovereign immunity "for any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort," *id.* at 281 (quoting 28 U.S.C. § 1491(a)(1)), and (2) the "bad men among the whites" provision of the Laramie Treaty, *id.* The Claims Court found that "[t]his case requires the court to determine the meaning of the phrase 'subject to the authority of the United States' contained in the first 'bad men' clause of

---

[4]   "Mr. Hotz is also subject to three years of supervised release . . . . [and] must pay restitution in the amount of $1,700 to the Department of Social Services Victims Compensation Services and amounts to be determined to the families of Ms. Randall and Mr. Whirlwind Horse." *Richard*, 98 Fed. Cl. at 280 n.1.

[5]   "Plaintiffs seek an award of $3,000,000 for both estates, plus costs, attorney's fees, and any other relief permitted under the Fort Laramie Treaty." *Richard*, 98 Fed. Cl. at 280.

Article I of the Fort Laramie Treaty," a determination that the trial court believed to be both the main jurisdictional question and an issue of first impression.[6] *Id.* at 284. The trial court ultimately held that

> [T]he Fort Laramie Treaty does not confer upon the Court of Federal Claims jurisdiction to entertain plaintiffs' claim because Mr. Hotz, who had no connection to the federal government (other than citizenship) at the time of the tragic incident, was not "subject to the authority of the United States" within the meaning of the first "bad men" clause contained in Article I of the Fort Laramie Treaty such that the United States can be held liable for plaintiffs' losses.

*Id.* Accordingly, the Claims Court dismissed the claim for lack of jurisdiction pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims. *Id.*

This court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

### DISCUSSION

Resolution of this case depends solely on the interpretation of the "bad men" provisions of the Laramie Treaty.[7]

---

[6]    *But see Tsosie*, 825 F.2d 393, which, as discussed below, has resolved this issue previously.

[7]    Additionally before the trial court was whether Appellants asserted a claim upon which relief can be granted under Rules of the Court of Federal Claims 12(b)(6). *Richard*, 98 Fed. Cl. at 282. The Government asserted that "the 'wrong' that occurred in this case falls outside the type of 'wrong' contemplated by the 'bad men' clause." *Id.* at 280. The trial court did not reach the merits of that argument. *See id.* "Whether a case must be dismissed under Rule 12(b)(6) is a question of law that

This court reviews a dismissal of a claim for lack of jurisdiction by the Court of Federal Claims *de novo. Bank of Guam v. United States*, 578 F.3d 1318, 1325 (2009). The underlying question of treaty interpretation is a question of law, reviewed *de novo. Barseback Kraft AB v. United States*, 121 F.3d 1475, 1479 (Fed. Cir. 1997) (citing *Cook v. United States*, 86 F.3d 1095, 1097 (Fed. Cir. 1996)). "[T]he Supreme Court has made clear that while the court should look to the parties' 'choice of words,' it should also consider the 'larger context that frames the Treaty,' including its 'history, purpose and negotiations.'" *Elk v. United States*, 87 Fed. Cl. 70, 79 (2009) (quoting *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 196-202, 119 S. Ct. 1187, 143 L. Ed. 2d 270 (1999)). "In evaluating this argument, we are mindful that 'treaties should be construed liberally in favor of the Indians.'" *Okla. Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 465-466, 115 S. Ct. 2214, 132 L. Ed. 2d 400 (1995) (quoting *County of Oneida v. Oneida Indian Nation of N.Y.*, 470 U.S. 226, 247, 105 S. Ct. 1245, 84 L. Ed. 2d 169 (1985)).

The Treaty text, the object and policy behind the Treaty, and this court's precedent dictate that the "bad

---

this court may answer in the first instance." *Bormes v. United States*, 626 F.3d 574, 583 (Fed. Cir. 2010) (citing Fed. R. Civ. P. 12(b)(6) advisory committee's note; *Highland Falls-Fort Montgomery Cent. Sch. Dist. v. United States*, 48 F.3d 1166, 1170 (Fed. Cir. 1995); *Thompson v. Microsoft Corp.*, 471 F.3d 1288, 1291 (Fed. Cir. 2006)). However, it is within this court's discretion to "allow the district court to consider first the government's motion to dismiss on that additional ground, as well as any others that have not been waived." *Id.* This court elects for the Claims Court to consider this issue on remand. *See also infra* 24 n.22.

men" provisions found in Article 1 of the Laramie Treaty of 1868 are not limited to "an agent, employee, representative, or otherwise acting in any other capacity for or on behalf of the United States."

## I.

### The Treaty Text Clearly Does Not Limit Bad Men Among The Whites To Governmental Actors

"The interpretation of a treaty, like the interpretation of a statute, begins with its text." *Medellin v. Texas*, 552 U.S. 491, 506, 128 S. Ct. 1346, 170 L. Ed. 2d 190 (2008). The relevant portion of the provision at issue states: "If bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will . . . [after steps not at issue here] reimburse the injured person for the loss sustained." 15 Stat. 635, 635. The structure of the treaty divides potential bad men into two categories, "bad men among the whites" and "bad men . . . among other people." *Id.* There are two issues to address: (1) whether the phrase "subject to the authority of the United States" applies to both categories or only the latter, and more importantly, (2) the definition of the phrase "subject to the authority of the United States." 15 Stat. 635, 635; *see Richard*, 98 Fed. Cl. at 284.

With regards to the former, the trial court assumed, without analysis or explanation, that "subject to the authority of the United States" applies to both categories, interpreting the text to say: There are bad men among the whites and there are bad men among other people, all of whom must be "subject to the authority of the United States," for the Treaty to apply. *See Richard*, 98 Fed. Cl. at 284. However, it is equally if not more reasonable to interpret the provision to raise two wholly separate

categories made parallel by the repeated use of the word "among," *i.e.*, there are bad men among the whites and, separately, there are bad men among other people who are subject to the authority of the United States.[8]

---

[8]    As published, commas set off the clause "or among other people subject to the authority of the United States," lending support to the interpretation that there are two wholly separate categories. Both parties dispute the significance of a comma in treaty interpretation. *See* Appellants' Brief at 4, 19-20; Appellee's Brief at 6, 33-35; Appellants' Reply at 4-5. Although Appellee is correct that "[a] single comma cannot overcome the intent of the parties," Appellee's Brief at 35 (citing *Hammock v. Loan and Trust Co.*, 105 U.S. 77, 26 L. Ed. 1111 (1881); *U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455, 462, 113 S. Ct. 2173, 124 L. Ed. 2d 402 (1993)), a single comma contradicting the intent of the parties is not the situation before this court. "Statutory construction is a holistic endeavor [that] . . . at a minimum, must account for a statute's full text, language as well as punctuation, structure, and subject matter," even if at times "Courts . . . should disregard the punctuation, or repunctuate, if need be, to render the true meaning of the statute." *U.S. Nat'l Bank of Oregon*, 508 U.S. at 454-55, 462 (internal citations omitted). In the context of the particular phrase here, the punctuation appears to have been included inconsistently and therefore is of limited use as an interpretive aid. *See* the Laramie Treaty as published, 15 Stat. 635, 635 ("If bad men among the whites, or among other people subject to the authority of the United States . . . ."); the Fort Laramie Treaty as signed, National Archives, Sioux Treaty of 1868, *http://www.archives.gov/education/lessons/sioux-treaty/images/sioux-treaty-1.jpg* (last visited March 9, 2012) ("If bad men among the whites or among other people, subject to the authority of the United States . . . ." ). *See also* Treaty with the Cheyenne Indian, 15 Stat. 655, 655 ("If bad men among the whites, or among other people . . . ." ); Treaty with the Navajo, 15 Stat. 667, 667 ("If bad men among the whites, or among other people . . .

Additionally, the parties dispute the definition of "subject to the authority of the United States." 15 Stat. 635, 635; *see Richard*, 98 Fed. Cl. at 284. The trial court accepted the Government's definition that "subject to the authority of the United States" is equivalent to "an agent, employee, representative, or [an individual] otherwise acting in any other capacity for or on behalf of the United States." *Richard*, 98 Fed. Cl. at 284, 289-90. The trial court offered no explanation and did not seem to consider why the alternative interpretation, that "subject to the authority of the United States" means persons governed by U.S. law, is not an equal if not more valid interpretation. *See*, *id.*

Appellants argue that "[t]he word 'whites,' as used in 'bad men among the whites,' is unambiguous," wholly separate from the other category (bad men among other people subject to the authority of the United States), and that "any 'white' can be a 'bad man.'" Appellants' Brief at 3 and 7. Appellants note the phrase "subject to the authority of the United States" immediately appears again in the following paragraph of the treaty, urging the court that these "two paragraphs must be construed together" in order for the same terms to be given consistent meaning. *Id.* at 12 (quoting 15 Stat. 635, 635).

Indeed, the next paragraph of the treaty incorporates this identical language in a way that cannot be read to contain the limitations expressed by the Claims Court: "If bad men among the Indians shall commit a wrong or depredation upon the person or property of any one,

---

."); Treaty with the Ute Indians, 15 Stat. 619, 620 ("If bad men among the whites or among other people . . . .").

white, black, or Indian,[9] *subject to the authority of the United States*, and at peace therewith . . . ." 15 Stat. 635, 635 (emphasis added) (quoted in Appellants' Brief at 5).[10]

---

[9]    The reference by the treaty drafters to "white" and "black" is demonstrative of inherent racism in 1868, *see, e.g.*, *Plessy v. Ferguson*, 163 U.S. 537, 41 L. Ed. 256, 16 S. Ct. 1138 (U.S. 1896), not an attempt to distinguish between government officials and others.  Appellants assert that

> "Whites" in "bad men among the whites" is unambiguous. It should be given its plain meaning. When the Treaty was signed, "white" meant "white." *United States v. Perryman*, 100 U.S. 235, 237-38 (1880) (statute enacted in 1834 providing that the United States would reimburse "friendly Indian" for property damage committed by a "white person" in Indian country does not apply to damage committed by a "negro"; Congress "meant just what the language ["white person"] conveys to the popular mind.")[.]  Today, "white" still means "persons whose racial heritage is Caucasian. WEBSTER'S UNABRIDGED DICTIONARY OF THE ENGLISH LANGUAGE 2167 (Random House 2001)."

Appellants' Brief at 12 (second bracket added).  However, the drafters of the Treaty were perfectly aware that American society consisted of "others" in addition to "whites."  Even the *Plessy* era Court of Claims referred to *United States v. Perryman*, 100 U.S. 235 (1880), as "somewhat remarkable," because it held that for purposes of reimbursement for Indian attacks the term "white person" does not include, under a different statute, a black man. *Janis v. United States*, 32 Ct. Cl. 407 (1897).

[10]    The Government argues the second instance of the use of the phrase "subject to the authority of the United States," "clearly modified 'Indian' rather than 'any one white, black,'" because "[i]t would make no sense for the United States to involve itself in situations where a citizen of one Indian nation committed a wrong against a citizen of another Indian nation." Appellee's Brief at 26-27.  The Government continues: "The only plausible

It would make little sense for the drafters of the Treaty to limit the terms of the Treaty to only acts committed by Indians against "anyone, white, black, or Indian, [who are government actors], and at peace therewith." 15 Stat. 635, 635.[11]

The Supreme Court has stated that it is an "established canon of construction" for "similar language contained within the same section of a statute [to be] accorded a consistent meaning." *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 501, 118 S. Ct. 927, 140 L. Ed. 2d 1 (1998). *See also SKF USA*

---

reason that the United States would become involved in such a situation is if the Indian were 'subject to the authority of the United States' – *i.e.*, an employee, agent or representative or someone who was working on the United States' behalf." *Id.* A more reasonable interpretation of this section has already been discussed by this court: "The literal text of article I and the "legislative history" of the treaty show that any "white" can be a "bad man" plus any nonwhite "subject to the authority of the United States," whatever that means, but most likely Indian nonmembers of the Navajo tribe but subject to United States law." *Tsosie*, 825 F.2d at 394; *see infra* 19 n.17.

[11]    Article II of the Laramie Treaty contains the phrase "officers, agents, and employees of the government," used to describe who "may be authorized to enter upon Indian reservations in discharge of duties enjoined by law." 15 Stat. 635, 636. The Treaty drafters knew this phrase; they would have used it in Article I if they intended to limit protection to only officers, agents, and employees of the government. "When Congress includes a specific term in one section of a statute but omits it in another section of the same Act, it should not be implied where it is excluded." *Arizona Elec. Power Co-op., Inc. v. United States*, 816 F.2d 1366, 1375 (9th Cir. 1987).

*Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (citing *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 479, 112 S. Ct. 2589, 120 L. Ed. 2d 379 (1992) (noting the "basic canon of statutory construction that identical terms within an Act bear the same meaning"); *Sullivan v. Stroop*, 496 U.S. 478, 484, 110 S. Ct. 2499, 110 L. Ed. 2d 438 (1990) (reaffirming the presumption that "identical words used in different parts of the same act are intended to have the same meaning"). *But cf. United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 213, 121 S. Ct. 1433, 149 L.Ed. 2d 401 (2001) ("Although we generally presume that identical words used in different parts of the same act are intended to have the same meaning, the presumption is not rigid, and the meaning [of the same words] well may vary to meet the purposes of the law.") (internal quotations and citations omitted) (brackets in original)).

Reading the phrase "subject to the authority of the United States" as only modifying the phrase "among other people" lessens the need to define "subject to the authority of the United States" in the case at hand; notwithstanding, the treaty text unambiguously distinguishes between "bad men among the whites" and government actors. If any ambiguity did exist, however, other avenues of statutory interpretation including the object and policy behind the provisions at issue lead to precisely the same result.

## II.

### The Object and Policy Reasons Underlying the Treaty Show It Was Written To Cover Provocations By All Non-Sioux

The Claims Court relied heavily, not on the text of the statute, but instead on the "Doolittle Commission" and the Commission's resulting report, *Condition of the In-*

*dian Tribes*,[12] as historical evidence that the phrase "subject to the authority of the United States" is equivalent to "an agent, employee, representative, or otherwise acting in any other capacity for or on behalf of the United States" and applicable to all "bad men." *See Richard*, 98 Fed. Cl. at 284 (citing S. Rep. No. 39-156 (1867)). The trial court determined, based on incidents of violence by soldiers found in the report, that "[t]he 'lawless white men' to which [*Condition of the Indians Tribes*] referred were apparently United States soldiers, who engaged in the 'indiscriminate slaughter of men, women, and children.'" *Id.* at 285 (quoting *Condition of the Indians Tribes*).

Appellants argue that "[n]o historical evidence supports the lower court's view . . .," Appellants' Brief at 17; however, the Government asserts that Appellants "simply ignore the substantial evidence cited by the lower court supporting the conclusion that the 'bad men' provision did not impose liability upon the United States for the actions of those who were not employees, representatives or agents of the United States," Appellee's Brief at 29 (citing

---

[12] In 1867, Native American tribal leaders, as well as members of the United States military and other officials, testified before a joint special committee chaired by Senator James R. Doolittle of Wisconsin ("Doolittle Commission") that was charged with inquiring into the condition of Native American tribes. The Doolittle Commission ultimately issued a report, *Condition of the Indian Tribes . . . ." Richard*, 98 Fed. Cl. at 284 (citing S. Rep. No. 39-156 (1867)). The report is 10 pages followed by an Appendix of over 500 pages which contains primary source material such as depositions and letters in response to questions from the Office of Indian Affairs. S. Rep. No. 39-156 (1867) (available at http://www.lexisnexis.com/congcomp/getdoc?HEARING-ID=HRG-1867-CTR-0001).

*Condition of the Indian Tribes*). Additionally, the Government asserts that "[a]s the lower court explained, the Doolittle Commission report establishes that the white men who were perpetrating wrongs against the Indians were, by and large, United States soldiers. *Id.* at 31. Finally, the Government claims that "it is clear from the legislative history of the statute that the parties were concerned with 'wrongs' perpetrated by United States soldiers and recognized the limitations on the United States' ability to control the behavior of white men who were not employees, agents or representatives of the United States." *Id.* at 36.

The Government's assertions are historically and factually inaccurate. In *Tsosie*, this court recognized the purpose of the Laramie Treaty of 1868 as being a "treaty . . . between two nations, and each one promised redress for wrongs committed by its nationals against those of the other nation." 825 F.2d at 400 n.2. To Appellants, this means "the [t]reaty sought to protect whites against Indians, and Indians against whites, not just to protect federal officers, agents of employees against Indians, and not just to protect Indians against federal officers, agents or employees." Appellants' Brief at 14. *Condition of the Indian Tribes*, the historical evidence offered by the trial court, when read in full, supports the position that "bad men" were both those associated with the government and those wholly unassociated. *See Condition of the Indian Tribes* at 3-4 ("Major General Pope says: They are rapidly decreasing in numbers from various causes: . . . [including] by cruel treatment on the part of the whites—both by irresponsible persons *and* by government officials.") (emphasis added); 4 ("General Carleton [responded] to the same question [:] . . . Indians alluded to are decreasing very rapidly in numbers [in part due to] . . . Wars with our pioneers *and* our armed forces.") (emphasis added); 5

("The committee are of [the] opinion that in a large majority of cases Indian wars are to be traced to *the aggressions of lawless white men, always to be found upon the frontier, or boundary line between savage and civilized life.* Such is the statement of the most experienced officers of the army.") (emphasis added); 6 ("On the other hand, the emigration from California and Oregon into the Territories from the west is filling every valley and gorge of the mountains with the most energetic and fearless men in the world. In those wild regions, where no civil law has ever been administered, and *where our military forces have scarcely penetrated*, these adventurers are practically without any law, except such as they impose upon themselves, viz: the law of necessity and self-defence.") (emphasis added)).[13]

Accordingly, the Claims Court's historical evidence and United States' history generally show that any "white" can be a "bad man" and that the United States government and specifically General Sherman, as chief negotiator of the Treaty, were concerned with friction created by more than just "bad acts" by whites serving in or with the armed forces of the United States.[14] Equally

---

[13] The heavy reliance of the Government and the Trial Court on this document as representative evidence of the history and policy behind this treaty is perplexing. Not only did the trial court selectively quote from the Doolittle Commission, there seems reason to believe the Doolittle Commission and the resulting text, *Condition of the Indian Tribes*, may be far from reliable as historical evidence. *See* Harry Kelsey, *The Doolittle Report of 1867: Its Preparation and Shortcomings*, 17.2 ARIZONA AND THE WEST 107, 120 (1975) ("In sum, the celebrated Doolittle report was incomplete and largely misleading").

[14] Sherman's overall concern was that the transcontinental railroads be completed and peaceful relations among the Native Americans, the United States military,

as persuasive as the factual history is the legal precedent, some of it binding, concerning the "bad men" provisions of the Laramie Treaty of 1868.[15]

and citizens not associated with the government were essential to that goal. Once the railroads were in operation, everything changed. As Sherman put it, the Commission prepared ". . . the way for the great Pacific Railroads, which, for better or worse, have settled the fate of the buffalo and the Indians forever. There have been wars and conflicts since . . . but they have been the dying struggles of a singular race of brave men fighting against destiny . . . the Indian question has become one of sentiment and charity, but not of war." WILLIAM TECUMSEH SHERMAN, *Memoirs of General W.T. Sherman*, [reproduction of Second Ed.] (Michael Fellman ed., Penguin Books 2000) (1875) at 783. As Justice Blackmun summarized, in part, the treaty terms seemed to effectuate this intent: "The Indians also expressly agreed to withdraw all opposition to the building of railroads that did not pass over their reservation lands, not to engage in attacks on settlers, and to withdraw their opposition to the military posts and roads that had been established south of the North Platte River." *United States v. Sioux Nation of Indians*, 448 U.S. 371, 375-76, 100 S. Ct. 2716, 65 L. Ed. 2d 844 (U.S. 1980) (citations omitted). The intent of the parties is of particular importance in this context: "Especially is this true in interpreting treaties and agreements with the Indians; they are to be construed, so far as possible, in the sense in which the Indians understood them, and 'in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people.'" *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 432, 63 S. Ct. 672, 87 L. Ed. 877 (1943) (quoting *Tulee v. Washington*, 315 U.S. 681, 684-85, 62 S. Ct. 862, 86 L. Ed. 1115 (1942)). In negotiating this treaty, there is no indication that the Sioux Nation would have understood the bad men provisions to only refer to government officials.

[15] The dissent says "the historical record stands for two propositions: (1) atrocities were committed by U.S.

## III.

### Precedent Prohibits The Trial Court's Holding

This court has previously found that the "bad men" provisions were not confined to wrongs committed by government employees. *See Tsosie*, 825 F.2d 393.[16]   In *Tsosie*, the court stated: "We hold . . . that the treaty provision in question [the "bad men" provision of Art. 1], even if infrequently invoked, has not become obsolete or

---

soldiers and civilians; and (2) controlling civilians would be difficult if not impossible." The historical record does indeed, *inter alia,* support these two contentions; however, the United States, in Art. II of the Treaty "solemnly agree[d] that no persons . . . except such officers, agents, and employees of the government as may be authorized . . . shall ever be permitted to pass over, settle upon, or reside in the territory described in this article." 15 Stat. 635, 636.   The United States had already committed to the difficult task of controlling civilians, an extremely difficult task that would prove to be troublesome. *Sioux Nation of Indians*. 448 U.S. at 378 n.8 ("In an interview with a correspondent from the Bismarck Tribune. published September 2. 1874. Custer recognized the military's obligation to keep all trespassers off the reservation lands. but stated that he would recommend to Congress 'the extinguishment of the Indian title at the earliest moment practicable for military reasons.'").

[16]   As mentioned above, *see supra* at 3 n.2, the treaty at issue in *Tsosie*, the Navajo Treaty, and the treaty in this case, the Laramie Treaty, are two of nine treaties made in 1868, "by and between commissioners representing the United States and chiefs of various previously hostile Indian tribes. The treaties were all duly ratified, proclaimed, and published in volume fifteen of the *Statutes at Large*. All say that peace is their object and all contain 'bad men' articles in similar language." *Tsosie*, 825 F.2d at 395.

been abandoned or preempted in any sense that affects its enforceability by suit in the Claims Court under the Tucker Act, 28 U.S.C. § 1491." *Tsosie*, 825 F.2d at 394. In rejecting the notion that the provision at issue had been preempted by changes in the law since the treaty's negotiation, notably since the advent of the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, we stated:

> [T]he "bad men" provision is not confined to "wrongs" by government employees. The literal text of article I and the "legislative history" of the treaty show that any "white" can be a "bad man" plus any nonwhite "subject to the authority of the United States," whatever that means, but most likely Indian nonmembers of the Navajo tribe but subject to United States law.

*Id.* at 400.[17] The court's finding in *Tsosie* is controlling here.[18]

---

[17] The lower court expressed that the "whatever that means" language from this passage of *Tsosie* is an "expressly noted ambiguity," indicating that this court "never explicated the meaning or scope of the clause" and as such, the trial court "cannot conclude that it possesses jurisdiction in this case based solely upon the Federal Circuit's observation." *Richard*, 98 Fed. Cl. at 286. It seems much more likely, however, that the ambiguity referred to is limited to the latter half of the passage in question, *i.e.*, the interpretation of the scope of a nonwhite who is "subject to the authority of the United States." Indeed, we stated "'wrongs' committed" "would likely be committed by soldiers in the immediate future," accepting not only that soldiers would be "bad men," but that others would be "bad men" as well in the less immediate future. *Tsosie*, 825 F.2d at 401-02.

[18] The Government claims, however, despite this language, that the relevant provisions of the Treaty are "outdated." Both the Government's position and the trial

After rejecting *Tsosie* as guiding precedent, the trial court then examined two types of cases: (1) where courts have reached the merits of claims alleging that "wrongs" were committed by "bad men" who were acting for or on behalf of the government, and (2) cases where "courts have dismissed claims failing to allege that 'wrongs' were committed by individual 'bad men' who were subject to the authority of the United States." *Richard*, 98 Fed. Cl. at 286-89. The trial court concluded that, among these cases, "[a] common thread is discernible . . . the court possesses jurisdiction over Article I 'bad men' clause

court's interpretation directly contradict the determinations of this court in *Tsosie*. The Government argues, for example, that Appellants' urged interpretation is grounded in a "hopelessly outdated notion that the Sioux and the United States are two independent sovereigns standing upon the precipice of war," Appellee's Brief at 7, and describes as absurdly outdated ". . . the idea that 'the Indians shall be responsible for what Indians do within the white man's territory and . . . , the Government will be responsible for what white men do within the Indian's territory,' *id.* at 45. The Government's obsolescence posture is disturbing. That the relative power of the parties to a treaty has changed over time is no ground for the treaty's modification or dissolution, nor does the Government offer any authority or support for its troubling argument. Treaty rights are not so easily dissolved. *See United States v. Dion*, 476 U.S. 734, 739, 777, 106 S. Ct. 2216, 90 L. Ed. 2d 767 (1986) (finding that Congress made "an unmistakable and explicit legislative policy choice" to abrogate Indian treaty rights and "Indian treaty rights are too fundamental to be easily cast aside."); *Menominee Tribe of Indians v. United States*, 391 U.S. 404, 412-413, 88 S. Ct. 1705, 20 L. Ed. 2d 697 (1968) ("While the power to abrogate [treaty] rights exists . . . the intention to abrogate or modify a treaty is not to be lightly imputed to the Congress.") (citations omitted).

claims where there exists a nexus between the individual committing the alleged 'wrong' and the United States." *Id.* at 289. The trial court relied on the absence of "bad men" cases brought against defendants who were not officers, agents, or employees of the federal government as evidence that such cases cannot be brought.[19]

---

[19] The dissent states "[t]he complete dearth of cases brought against non-government 'whites' testifies to a practical construction adopted by the parties over an exceedingly long period of time, evidence that the Sioux and the United States did not intend that this agreement cover persons not affiliated with the United States government." Certainly, to determine treaty rights, "we look beyond the written words to the larger context that frames the Treaty, including the history of the treaty, the negotiations, and the practical construction adopted by the parties." *Minn. v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 196, 119 S. Ct. 1187, 143 L. Ed. 2d 270 (1999) (citations omitted). However, given the relative power of the treaty parties and the position of financial and social dependence into which the Sioux Nation was forced, it is questionable, at best, to apply the practical construction precept in the negative, viz., because cases have not been brought against non-governmental actors, the original parties intended the treaty to be so limited. This is in contrast to the cases where practice over time was used to determine the intent of parties of equal power. *See New Jersey v. New York*, 523 U.S. 767, 831-832, 118 S. Ct. 1726, 140 L. Ed. 2d 993 (1998) (Scalia, J., dissenting) (turning to the actions of New York and New Jersey as evidence of the meaning of the Compact of 1834 and the ownership of Ellis Island); *Air France v. Saks*, 470 U.S. 392, 403-404, 105 S. Ct. 1338, 84 L. Ed. 2d 289 (1985) (turning to the conduct of the parties to the Warsaw Convention and the subsequent interpretations of the signatories to clarify the term in question); *Massachusettes v. New York*, 271 U.S. 65, 94-96, 46 S. Ct. 357, 70 L. Ed. 838 (1926) (turning to the "long acquiescence" of Massachusetts as evidence of New York's right to the land under the Treaty of Hartford).

However, as pointed out in *Tsosie*, "[p]rolonged nonenforcement, without preemption, does not extinguish Indian rights." 825 F.2d at 399.[20]  In addition, there are other cases that provide guidance for our interpretation, indicating that the "bad men" provisions should not be limited as defined by the trial court.  For example, as articulated in *Janis v. United States*:

> In a somewhat remarkable case, *United States v. Perryman* (100 U.S. [ ] 235), the Supreme Court has held that the term "a white person" in section 16 of the act of 1834 (section 2154 of the Revised Statutes) does not include a black man.  That is to say, the Supreme Court has held of a crime perpetrated by a black man in the Indian country in stealing the property of a friendly Indian, amid circumstances which would have rendered the Government liable if the perpetrator had been a white man, that the Government is not liable; and that for such a depredation a friendly Indian can not recover, though the black man was a citizen of the United States. *The [Laramie] treaty is more comprehensive than the act of 1834.* It provides against depredations both by whites and by "other persons subject to the authority of the United States;" and conversely it holds the Indians liable for a depredation upon the person or property of

---

[20]   The Government also asserts that the "Court appeared to leave open the possibility that the FTCA had preempted the bad men provision, declining to state explicitly that it had not . . . ." Appellee's Brief at 22.  The Government seems to be ignoring the direct statement from the court: "The Federal Tort Claims Act, 28 U.S.C. § 2671 and ff has been, since 1946, a notable change, but it cannot seriously be argued to constitute preemption." *Tsosie*, 825 F.2d at 400.

anyone "subject to the authority of the United States," be he "white, black, or Indian."

*Janis v. United States*, 32 Ct. Cl. 407, 410-411 (1897) (emphasis added).[21]   Also, in *Ex parte Crow Dog*, the Supreme Court articulated the following with regards to the "bad men" provisions of the Laramie Treaty:

> But it is quite clear from the context that this does not cover the present case of an alleged wrong committed by one Indian upon the person of another of the same tribe.  The provision must be construed with its counterpart, just preceding it, which provides for the punishment by the United States of any bad men among the whites, or among other people subject to their authority, who shall commit any wrong upon the person or

---

[21]   As *Janis* makes clear in the context of interactions between Native Americans and African Americans, the Fort Laramie treaty was intended when drafted to protect against and indemnify for the bad acts committed by more than just white men.  That fact is not necessarily inconsistent with the dissent's narrow point; there were multiple regiments of African American troups on the frontier functioning as governmental actors. *See* Quintard Taylor, *African American Men in the American West, 1528-1990*, 569 ANNALS 102, 108 (2000) ("Twenty-five thousand black men served in the 9th and 10th Cavalry and the 24th and 25th Infantry of the United States Army between 1866 and 1917.").  It is, however, fatal to the government's and the dissent's broader claim that "bad men among the whites, or among other people subject to the authority of the United States," was necessarily and intentionally limited to governmental actors.  Although in dicta, *Janis* establishes that under the Treaty, the "stealing [of] property of a friendly Indian" by a black man not a government actor "would have rendered the government liable." *Janis*, 32 Ct. Cl. at 410-411.

property of the Indians. Here are two parties, among whom, respectively, there may be individuals guilty of a wrong against one of the other -- *one is the party of whites and their allies, the other is the tribe of Indians with whom the treaty is made.*"

*Ex parte Crow Dog*, 109 U.S. 556, 557-558, 3 S. Ct. 396, 27 L. Ed. 1030 (1883) (emphasis added). Clearly, any "white" can be a "bad man" within the terms of the Laramie Treaty.[22]

## CONCLUSION

The Treaty text, the object and policy behind the Treaty, and this court's precedent dictate that the "bad men" provisions found in Article 1 of the Laramie Treaty of 1868 are not limited to "an agent, employee, representative, or otherwise acting in any other capacity for or on behalf of the United States." *Richard*, 98 Fed. Cl. at 284.

---

[22] The trial court asserted, and the Government echoed on appeal, that "Plaintiffs' interpretation yields an absurd result and imposes upon the federal government an impossible task: to guarantee the safety and tranquility of all Native Americans on reservations during any and all of their interactions with anyone." *Richard*, 98 Fed. Cl. at 290. *See* Appellee's Brief at 43-46. Appellant responds that claims made under this provision are limited both by the "precise contours of 'wrong,'" and by geography. Appellant's Brief at 26. Indeed, claims under this provision are limited to the clear geographic limits found in the Treaties; additionally, because the Treaty determines offenders are to "be arrested and punished according to the laws of the United States," "wrongs" seem to be limited to the criminal jurisdiction of the United States. 15 Stat. 635, 635. However, we have determined that arguments as to the contours of "wrongs" are to be considered in the first instance by the Claims Court. *See supra* 6 n.7.

Because we conclude the "bad men" provisions of the Laramie Treaty of 1868 is not so limited, the Claims Court improperly dismissed Appellants' Complaint for lack of jurisdiction. Accordingly, we vacate and remand for further proceedings.


**VACATE AND REMAND**

# United States Court of Appeals for the Federal Circuit

---

**JAMES RICHARD, SR., (PERSONAL REPRESENTATIVE OF THE ESTATE OF CALONNIE D. RANDALL, DECEASED), AND JON WHIRLWIND HORSE, (PERSONAL REPRESENTATIVE OF THE ESTATE OF ROBERT J. WHIRLWIND HORSE, DECEASED)**
*Plaintiffs-Appellants,*

**v.**

**UNITED STATES,**
*Defendant-Appellee.*

---

2011-5083

---

Appeal from the United States Court of Federal Claims in Case No. 10-CV-503, Judge Margaret M. Sweeney.

---

LOURIE, *Circuit Judge*, dissenting.

I respectfully dissent from the majority's decision to vacate and remand the United States Court of Federal Claims' ("Claims Court") dismissal of the claim in this case.

The Claims Court concluded that the "bad men" provision from the Fort Laramie Treaty of 1868 does not render the United States liable for wrongs committed by

those who are not "subject to the authority of the United States"—*i.e.*, employees, agents, or representatives of the United States or otherwise acting upon the United States' behalf. *Richard v. United States*, 98 Fed. Cl. 278, 290 (2011). As the drunk driver in this case was not such a person, the Claims Court dismissed the case for lack of jurisdiction. I would affirm that decision.

There is a tension here between waiver of sovereign immunity and construction of treaties with the Indians. On the one hand, waivers of sovereign immunity, including the Tucker Act, must be narrowly construed. *Radioshack Corp. v. United States*, 566 F.3d 1358, 1360 (Fed. Cir. 2009). On the other hand, we also construe discrepancies in favor of the Native Americans without extending the treaty beyond its bounds in order to meet varying alleged injustices. *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 200 (1999) (citations omitted). The Supreme Court recently noted in *Cooper* that "a waiver of sovereign immunity must be 'unequivocally expressed'" and "[l]egislative history cannot supply a waiver that is not clearly evident from the language." *Fed. Aviation Admin. v. Cooper*, No. 10-1024, 2012 WL 1019969, at *5 (U.S. Mar. 28, 2012) (citations omitted). "Any ambiguities . . . are to be construed in favor of immunity so that the Government's consent to be sued is never enlarged beyond what a fair reading of the text requires." *Id.* (citations omitted). The Supreme Court added that such "[a]mbiguity exists if there is a plausible interpretation of the statute that would not authorize money damages against the Government." *Id.* "We also construe any ambiguities in the scope of a waiver in favor of the sovereign." *Id.* In that event, the "scope of Congress' waiver [must] be clearly discernable" and "[i]f it is not, then we take the interpretation most favorable to the Government." *Id.* In this case, in my view, the scope of

Congress' waiver is not clearly discernable in the treaty and the balance therefore rests on the side of sovereign immunity.

A treaty with an Indian tribe is a contract, and it should be interpreted to give effect to the intent of the signatories. *Washington v. Wash. State Comm. Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 675 (1979) ("A treaty . . . is essentially a contract between two sovereign nations."); *Santovincenzo v. Egan*, 284 U.S. 30, 40 (1931); *Tsosie v. United States*, 825 F.2d 393, 397 (Fed. Cir. 1987). In discerning the intent of the signatories to a treaty, we look to the parties' "choice of words" and the "larger context that frames the treaty, including 'the history of the treaty, the negotiations, and the practical construction adopted by the parties.'" *Minnesota*, 526 U.S. at 196 (quoting *Choctaw Nation v. United States*, 318 U.S. 423, 432 (1943)); *see also Medellin v. Texas*, 552 U.S. 491, 507, 516–517 (2008) (considering postratification understanding of the parties); *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 167 (1999) (same). In this fashion, treaties are construed "to give effect to the terms as the Indians themselves would have understood them." *Minnesota*, 526 U.S. at 196; *Choctaw Nation v. Oklahoma*, 397 U.S. 620, 631 (1970).

The Claims Court thoroughly reviewed the historical context surrounding the Fort Laramie Treaty of 1868, including both the Indian Peace Commission Report of 1868 and the Doolittle Commission Report from 1867 cited by the majority. The Claims Court, quoting the Doolittle Commission Report, concluded that:

> The Doolittle Commission observed that "useless wars with the Indians" could "be traced to the aggressions of lawless white men, always to be found upon the frontier." The "lawless white men" to

which [Doolittle Commission Report] referred were apparently United States soldiers, who engaged in the "indiscriminate slaughter of men, women, and children...."

*Richard*, 98 Fed. Cl. at 285 (citations omitted). The court then listed a number of entries in the Doolittle Commission Report describing massacres, butchering, and murder by United States soldiers. *Id.* The Doolittle Commission Report also noted that it was "*difficult if not impossible* to restrain white men, especially white men upon the frontiers from adopting [savage] warfare against the Indians." *Id.* (emphasis added). Consequently, as the court noted, the Doolittle Commission Report recommended that Congress establish five boards of inspection of Native American affairs that would, among other things, inquire into conduct of the military toward tribes in order to "preserve peace and amity." *Id.* (citations omitted).

Similarly, the Indian Peace Commission Report, as the court also pointed out, likewise noted the difficulty of containing all of the Indian Tribes' complaints:

In making treaties it was enjoined on us to remove, if possible, the causes of complaints on the part of the Indians. *This would be no easy task.* We have done the best we could under the circumstances.... The best possible way then to avoid war is to do no act of injustice. When we learn that the same rule holds good with Indians, the chief difficulty is removed. But it is said our wars with them have been almost constant.

*Id.* (emphasis added). In an effort to settle this conflict, the United States entered into nine treaties between various hostile Indian tribes in the United States, including the Fort Laramie Treaty. *Id.* at 282.

The majority opinion focuses on the accounts in the Doolittle Commission Report's of atrocities by civilians. Majority Op. at 13–17. But just because the Doolittle Commission Report listed those acts does not mean the treaty was intended or understood to prevent all of them, especially in light of the same reports noting the difficulty of such a task. Indeed, the Doolittle Commission Report is not legislative history; it is historical context. In other words, the historical record stands for two propositions: (1) atrocities were committed by U.S. soldiers and civilians; and (2) controlling civilians would be difficult if not impossible.

Given this historical backdrop, one must discern the meaning of the phrase "bad men among the whites, or among other people subject to the authority of the United States" as the parties themselves would have understood it, informed by the practical construction adopted by the parties. *See Minnesota*, 526 U.S. at 196. In the over 144 year history of the Fort Laramie Treaty, neither party nor the majority has been able to identify a single case brought by an Indian individual against a "white" person who was not an employee, agent, representative of the United States or otherwise acting upon the United States' behalf that has been found liable and upheld by any appellate or district court. Instead, as the Claims Court pointed out, the "bad men" line of cases points to one common thread: "the court possesses jurisdiction over Article I 'bad men' clause claims where there exists a nexus between the individual committing the alleged 'wrong' and the United States." *Id.* at 289.

As the court showed, in each of the cases, the bad men were individuals ("white" or "other people") who were "subject to the authority of the United States" in some capacity. *Id.* at 289–90; *see, e.g.*, *Tsosie*, 825 F.2d at 397 (involving a United States Public Health Service Hospital

employee); *Begay v. United States*, 219 Ct. Cl. 599 (1979) (teachers, both white and Native American, who were employed at a Bureau of Indian Affairs school); *Hebah v. United States*, 456 F.2d 696 (Ct. Cl. 1972) (Indian Police Force officer subject to the authority of Department of the Interior); *Elk v. United States*, 70 Fed. Cl. 405 (2006) (U.S. Army staff sergeant). In fact, the earliest case brought against a person unaffiliated with the Federal government appears to be *Hernandez* in 2010, which was dismissed for lack of subject matter jurisdiction because he was not a federal employee. *Hernandez v. United States*, 93 Fed. Cl. 193, 200 (2010) (involving an officer who was employed by WING, a non-federal agency). The sound reasoning of the Claims Court derived from these cases has already been independently followed at least by one other U.S. District Court. *Banks v. Guffy*, No. 1:10-CV-2130, 2012 WL 72724, *7 & n.10 (M.D. Pa. Jan. 10, 2012) (slip copy).

In the interim century and a half since the treaty was signed, there have undoubtedly been wrongs committed against the Sioux by white, non-government men. The complete dearth of cases brought against non-government "whites" testifies to a practical construction adopted by the parties over an exceedingly long period of time, evidence that the Sioux and the United States did not intend that this agreement cover persons not affiliated with the United States government. The "bad men" cases support this understanding. It is not for us to in effect create a new remedy in the Claims Court, as the majority does, that neither the courts nor the Sioux contemplated for over 140 years, and for which the government has not waived sovereign immunity.

The majority relies on the following passage from *Tsosie* as constituting a holding and controlling our interpretation of the "bad men" provision:

> [T]he "bad men" provision is not confined to "wrongs" by government employees. The literal text of article I and the "legislative history" of the treaty show that any "white" can be a "bad man" plus any nonwhite "subject to the authority of the United States," whatever that means, but most likely Indian nonmembers of the Navajo tribe but subject to United States law.

*Tsosie*, at 400. However, a plain reading of this statement is merely that the "bad men" provision is broader than government employees. It does not define the outer limit. Indeed, the "bad man" at issue in *Tsosie* was a government employee at a United States hospital. *Id.* at 397. Thus any broader interpretation was not a holding, but was dictum. Likewise, we did not define "whites" or rule whether the term "whites" was modified by "subject to the authority of the United States." We declined to do so, and simply noted the ambiguity of the phrase "subject to the authority of the United States." *Id.* at 400 ("whatever that means"). In contrast to *Tsosie*, this case turns on the outer limit of "whites" and "subject to the authority of the United States."

The majority also quotes *Tsosie* as stating: "We hold . . . that the treaty provision in question [the "bad men" provision of Art. 1], even if infrequently invoked, has not become obsolete or been abandoned or preempted in any sense that affects its enforceability by suit in the Claims Court under the Tucker Act, 28 U.S.C. § 1491." Majority Op. at 18–19. Again, such is not a holding that the "bad men" provision is not limited to government actors, given the fact that the offending white party in *Tsosie* was a United States government employee, *i.e.*, a government hospital employee. Instead, it merely holds that the "bad men" provision is still generally enforceable under the Tucker Act, which is not questioned in this appeal.

The majority is correct that we noted in *Tsosie* that "[p]rolonged nonenforcement, without preemption, does not extinguish Indian rights." *Tsosie*, 825 F.2d at 399. But the Claims Court did not hold that the "bad men" provision is no longer enforceable. Instead the Claims Court stated that the United States and the Sioux did not intend that the "bad men" provision cover those who are not employees, agents, or representatives of the United States or otherwise acting upon the United States' behalf. That is distinct from whether treaty rights have been abrogated by nonenforcement as discussed in *Tsosie*.

The majority gives much weight to the use of "subject to the authority of the United States" in the second "bad men" clause. Majority Op. at 10–13. In particular, the majority argues that it makes "little sense" to have the terms of the Treaty limited to acts committed by Indians against "anyone, white, black, or Indian, [who are government actors], and at peace therewith." Majority Op. at 9–10. Instead, the majority suggests that the term "subject to the authority of the United States" could likely mean "persons governed by U.S. law." Majority Op. at 10. But it would make even less sense for the United States to be involved with citizens of one Indian nation committing a wrong against a citizen of another Indian nation, as the majority's view would suggest. As the government notes, the phrase "at peace therewith" immediately follows "subject to the authority of the United States." The United States was not at war with its own citizens in 1868. The logical conclusion is that "subject to the authority of the United States" (and "at peace therewith") as used in the second "bad men" clause only modifies "Indians."

As noted by the majority, the comma placement between "whites, or among other people" is inconclusive as an interpretive aid in the context of the particular phrase

here. Majority Op. at 9 n.8. Given the comma ambiguity, it is, therefore, equally as likely that the drafters intended both categories, "whites" and "among other people" to be modified by "subject to the authority of the United States" while avoiding unnecessary repetition. In other words, while the phrase could have been written: "whites, subject to the authority of the United States, or among other people, subject to the authority of the United States" the drafters could have easily discarded the unnecessary surplusage and ended with: "whites or among other people, subject to the authority of the United States" as in the Fort Laramie Treaty as signed.

I would take judicial notice of what may well be the original version of the treaty, obtained from the National Archives, which contains the comma after "among other people." *See* National Archives, Sioux Treaty of 1868, *http://www.archives.gov/education/lessons/sioux-treaty/images/sioux-treaty-1.jpg* (last visited Apr. 11, 2012). That would lead to the conclusion, as discussed above, that "subject to the authority of the United States" was meant by the parties to modify both "whites" and "among other people," supporting the interpretation that "whites" had to be subject to the authority of the United States government for liability to apply. Even so, given the ambiguity in the text, the historical context and the practical construction adopted by the parties over the following century and a half are needed to inform us what was intended by the parties.

As discussed above, the historical context of the treaty and the practical construction adopted by the parties in the intervening 140 years of its enforcement all suggest that it is unlikely that the federal government would broadly have waived sovereign immunity, opened its coffers, and, as the Claims Court stated, agreed to the impossible task of guaranteeing the safety and tranquility

of all Native Americans on reservations from any and all of their interactions with anyone. In other words, the signatories, including the Indians themselves, would have understood "bad men among the whites, or among other people subject to the authority of the United States" to mean "employees, agents, or representatives of the United States or otherwise acting upon the United States' behalf."

I finally note that the plaintiffs are not without an avenue for redress. The briefing before us represents that the plaintiffs are currently pursuing damages against the drunk driver. In any event, I see no reason to reverse the trial court, which decided the case correctly. I therefore respectfully dissent.